

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-25-2007

# Xiao v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2170

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Xiao v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1746.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1746

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2170

JIN YUN XIAO,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review of an Order of
The Board of Immigration Appeals
(No. A395-163-383)
Immigration Judge: Eugene Pugliese

Argued April 17, 2006

Before: SLOVITER, AMBRO and Michel,* Circuit Judges,

(Opinion filed January 25, 2007)

Stuart Altman, Esquire (Argued)
Law Office of Stuart Altman
264 East Broadway, Suite 1003C
New York, NY 10002

    Counsel for Petitioner

---

    *Honorable Paul R. Michel, Chief Judge, United States Court of Appeals for the
Federal Circuit, sitting by designation.

Peter D. Keisler
    Assistant Attorney General
Jeffrey J. Bernstein (Argued)
    Senior Litigation Counsel
Richard M. Evans, Esquire
Nancy E. Friedman, Esquire
United States Department of Justice (Litigation)
P.O. Box 878
Ben Franklin Station
Washington, D.C.   20044

Cynthia E. Messersmith, Esquire
U.S. Department of Justice, Tax Division
717 North Harwood Street, Suite 400
Dallas, TX   75201

        Counsel for Respondent

_____

OPINION  OF  THE  COURT

_____

AMBRO, Circuit Judge

Jin Yun Xiao petitions for our review of the order of the Board of Immigration

Appeals ("BIA" or "Board") denying her motion to remand and affirming the denial by an

immigration judge ("IJ") of her claims for asylum, withholding of removal, and relief

under the United Nations Convention Against Torture ("CAT" or the "Convention").[1]

We deny her petition as to the CAT claim, but remand her claims for asylum and

_____

[1]United Nations Convention Against Torture and Other Cruel, Inhuman, or
Degrading Treatment or Punishment, G.A. Res 39/46, U.N. GAOR, 39th Sess., Supp.
No. 51, at 197, U.N. Doc. A/39/51 (1984).

2

withholding of removal.

## I.  Factual Background

Jin Yun Xiao is a citizen of the People's Republic of China.  She is married to another asylum applicant, Jian Feng Chen, with whom she has two children, both born in the United States.[2]   In support of her applications for relief from removal, Xiao testified as follows.

Pursuant to China's population and family planning laws, Xiao and other women in her neighborhood in China were required to submit to urine tests and gynecological exams to detect pregnancy every three months beginning at the age of 18.  On one occasion Xiao was fined when she went out of town and was unable to return in time for her examination.  Xiao also testified that her husband's aunt had two daughters and, as a result, was forced to undergo sterilization.[3]  In addition, one of her cousins, who had one son, was forced to hide to have additional children, and her house was "dismantled" by the government.

Xiao testified that, as a result of the frequent, invasive gynecological examinations (allegedly rendered particularly uncomfortable because Xiao was a young, unmarried

---

[2]Xiao and her husband met in China, were denied permission to marry by the Chinese government because of their age, and only married legally in 2002 in the United States.

[3]The record also contains a supporting written statement from her husband's uncle stating that his wife was detained for failure to have a birth permit for the birth of her child; she was sterilized and the uncle was fined.

3

woman and the doctors were men), she became depressed. A concerned friend took her to an underground Protestant church; Xiao attended once a week and began to lead a Bible study group in her home. She was baptized in December, 1994.

In 1995, Xiao's future husband, Chen, and several other church members were arrested while at church. Chen was detained, interrogated about his religious activities, and beaten over the course of three days. He left China two months later due to the persecution he feared from the government. After the 1995 incident, church members were forced to change meeting times and hold services at night. The record contains a statement from Xiao's mother-in-law that she was at the disrupted church meeting, her son was detained and beaten for three days, and that she was detained for seven days on the charge of causing other people to violate the public order.

Almost six years later, in April 2001, Xiao was arrested for her religious practices. Police came to her home when she was leading a Bible study group, threatened and cursed her, and accused her of holding an illegal gathering. She was arrested and detained. In detention she was slapped, harassed, and deprived of food; she also testified that the police tried to persuade her to abandon her religion. The record contains a statement from Xiao's church friend, who stated she was at the disrupted Bible study meeting, that Xiao and she were brought to the police station, and that she was beaten and detained for one day. Xiao testified that after her arrest she was required to report to the police once a month to disclose her daily activities. She was told she would be

4

arrested if she did not report.

Xiao left China in June 2001, allegedly because she feared the government would continue to persecute her. In the United States she attends Grace Church in the Chinatown area of New York City. The Church's doctrine, which Xiao claims she believes and abides by, maintains that abortion and birth control are wrong. Her religion prohibits her and her husband from using any birth control and they have two children, a three year-old and an infant. They would like to have more children, but claim this would be impossible if they return to China because of the country's population control laws. Xiao fears forced sterilization or forced abortion in the event she becomes pregnant again. She also fears reprisal from the Chinese government for having left the country without proper documentation and having had two children without obtaining a birth permit for either one. Xiao testified also that a family member told her that police had come to her home in China looking for her after she left the country.

## II. Procedural Background

Xiao entered the United States without valid documentation. The Immigration and Naturalization Service ("INS")[4] subsequently issued a Notice to Appear, alleging that Xiao was inadmissible. Such a person is removable under 8 U.S.C. § 1227(a)(1).

---

[4]On March 1, 2003, the INS was merged into the Department of Homeland Security, and is now called the Bureau of Immigration and Customs Enforcement. However, since the case began as an INS matter, we shall continue to refer to the INS in this opinion.

5

Xiao conceded her removability,[5] but filed an application for asylum under 8 U.S.C. § 1158 and withholding of removal under 8 U.S.C. § 1231(b)(3), and sought protection under the CAT.

A.    The IJ's decision

IJ Eugene Pugliese denied each of Xiao's claims on the ground that she was not credible (and even assuming credibility, the Chinese government's treatment of her did not rise to the level of persecution).

*1.    Credibility*

The IJ's incredibility determination was based on the following four conclusions. First, it was "not believable" that Xiao could have attended church on a weekly basis for eight years with only two "busts" by the "incredibly competent" Chinese government. Xiao's contention that church members avoided detection by changing meeting times and locations was an "implausible, not very realistic, and also unsatisfactory explanation."

Second, the IJ found that Xiao's demeanor was that of someone who "does not really want to be here, [and] does not want to answer questions," because at no point did

_____

[5]Xiao also claims she requested, in the alternative, voluntary departure. The IJ found Xiao removable as charged and denied her requests for asylum, withholding of removal, and protection under the CAT. The IJ did not issue a specific order regarding voluntary departure, having noted in the body of the opinion that Xiao "had not requested, nor qualified herself for, voluntary removal." (Xiao notes this discrepancy in her brief, but the Government does not mention it, and there is nothing in the record that explains the variance.) Because we conclude that the case calls for a remand, we need not address this issue.

6

she make eye contact with the IJ. The IJ stated that there are no cultural reasons that would suggest Chinese people discussing abortion cases would be any less willing to make eye contact than anyone else, so he took her reticence as evidence that she was "ashamed" of making false statements.

Third, the IJ concluded that Xiao's "knowledge" of the Bible did not mean she actually has any religious beliefs, as one can be knowledgeable about something without believing in it. (The IJ noted that Xiao "testified at some length with regard to her knowledge of the Bible," but "the fact that she knows something about Christianity is no more reason to necessarily assume that she is a Christian than if someone knows something about flying saucers to assume that they [sic] believe in flying saucers.")

Finally, Xiao's husband did not appear in court despite having been urged by the IJ at the master calendar hearing to attend. The IJ interpreted his absence to mean that Xiao and her husband feared being separated and having their testimony compared and found to be inconsistent.

*2. Persecution*

The IJ's conclusion that Xiao's treatment did not rise to the level of persecution was based on the following determinations. First, he stated that there was no evidence of a pattern or practice of persecution of Christians by the Chinese government. He noted that Christian churches are allowed to exist in China, although the requirement that religions have to register with the government does suggest "a certain degree of

7

suppression of religion." Moreover, he found that neither the single arrest of Xiao, nor the mandatory gynecological exams, rose to the level of persecution. As for the exams, the IJ observed, "[i]t may be unfair, it may be a policy that we would not want to have here in the United States, that we would reject and that we would oppose," but it is insufficient to prove persecution. Finally, the IJ concluded that there was no evidence to support Xiao's testimony that something bad will happen to her upon her return to China as a result of having left the country "illegally."

B.     The BIA's decision

Xiao appealed to the BIA, arguing that the IJ erred as a matter of law in dismissing her applications for relief. During the pendency of her appeal, she filed a motion to remand due to changed circumstances (she became pregnant with her second child). Specifically, Xiao argued that if she returned to China while pregnant, she would be forced to undergo an abortion, and if she returned after giving birth, she would be forcibly sterilized.

The BIA dismissed Xiao's appeal, in effect affirming both the IJ's adverse credibility determination and his conclusion that her experiences did not constitute persecution. In the same opinion, the BIA denied Xiao's motion to remand, citing the lack of evidence that China has a national policy of implementing its population control law regarding children born outside of China and "insufficient evidence . . . that [Xiao] will be sterilized by the Chinese authorities for the [out-of-China] birth." Xiao filed a

8

timely petition for review to our Court.[6]

### III. Discussion

A.  <u>Asylum, withholding of removal, and the motion to remand</u>

*1.  Applicable Law*

The Attorney General and his delegates may grant asylum to any alien who

qualifies as a refugee under the Immigration and Nationality Act ("INA").  8 U.S.C. §

1158(b)(1).  Thus, Xiao must demonstrate that she meets the statutory definition of

"refugee" under the INA, which is

> any person who is outside any country of such person's nationality . . . and
> who is unable or unwilling to return to, and is unable or unwilling to avail
> himself or herself of the protection of, that country because of persecution
> or a well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political opinion
> . . . .

8 U.S.C. § 1101(a)(42).

This definition has been amended to address specifically Congress' concern with

coercive family planning practices, by providing, *inter alia*, that

> a person who has been forced to abort a pregnancy or to undergo
> involuntary sterilization, or who has been persecuted for failure or refusal
> to undergo such a procedure or for other resistance to a coercive population
> control program, shall be deemed to have been persecuted on account of
> political opinion, and a person who has a well founded fear that he or she
> will be forced to undergo such a procedure or subject to persecution for
> such failure, refusal, or resistance shall be deemed to have a well founded
> fear of persecution on account of political opinion.

_____

[6]We have jurisdiction over Xiao's petition pursuant to 8 U.S.C. § 1252.

9

*Id.*.

In *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993), we defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *See also Li v. Att'y Gen.*, 400 F.3d 157, 167 (3d Cir. 2005). "An applicant who establishes that he or she has suffered past persecution on account of one of the five grounds enumerated in the INA triggers a rebuttable presumption of a well-founded fear of future persecution, as long as that fear is related to the past persecution." *Singh v. Gonzales*, 406 F.3d 191, 195-96 (3d Cir. 2005) (internal quotation marks and citations omitted).

To establish a well-founded fear of future persecution, in the absence of proof of past persecution, an applicant must first demonstrate a subjective fear of persecution through credible testimony that her fear is genuine. *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir. 2003). Second, the applicant must show objectively that "a reasonable person in the alien's circumstances would fear persecution if returned to the country in question." *Id*. To satisfy the objective prong, a petitioner must provide evidence he or she would be individually singled out for persecution or demonstrate that "there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 C.F.R. § 208.13(b)(2)(iii)(A). "While it is unclear precisely how likely persecution must be to

10

render an applicant's fear of future persecution well-founded, '[o]ne can certainly have a well founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Guo v. Ashcroft*, 386 F.3d 556, 565 (3d Cir. 2004) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)).[7]  Moreover, "the acts must be committed by the government or forces the government is either unable or unwilling to control." *Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006).  Aliens have the burden of supporting their asylum claims.  *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002).  "[A]n applicant's credible, persuasive, and specific testimony may suffice to establish an objective fear of persecution." *Lukwago v. INS*, 329 F.3d 157, 177 (3d Cir. 2003) (internal quotation marks and citation omitted).

2.     *Standard of Review*

Insofar as the BIA adopts the decision and findings of the IJ, we review the latter. *Sukwanputra*, 434 F.3d at 631.  That is because the "IJ's opinion effectively becomes the BIA's . . . ." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001).  As to matters

---

[7]Withholding of removal does not rely on the perspective of the applicant's well-founded fear, but is instead appropriate only if the Attorney General determines there is a "clear probability" that the alien's life or freedom would be threatened upon her removal to a particular country. *INS v. Stevic*, 467 U.S. 407, 430 (1984); *see also* 8 U.S.C. § 1231(b)(3)(A).  Though asylum is discretionary, withholding of removal is mandatory if the applicant shows that it is "more likely than not" he or she will be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion if deported to his or her home country. *Lukwago v. INS*, 329 F.3d 157, 182 (3d Cir. 2003).  As such, "[i]f [a petitioner] is unable to satisfy the standard for asylum, he necessarily fails to meet the standard for withholding of removal under [the INA]." *Id.*

11

where the BIA issued its own opinion and did not summarily adopt the IJ's opinion, we review the former. *Sukwanputra*, 434 F.3d at 631; *Li*, 400 F.3d at 162.

We review the BIA's affirmance of an IJ's factual findings, including its determination of whether an alien was subject to persecution or has a well-founded fear of persecution, under a substantial evidence standard. *See, e.g., Shardar v. Ashcroft*, 382 F.3d 318, 323 (3d Cir. 2004). In conducting this analysis, we consider the record as a whole and shall reverse only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Zheng v. Gonzales*, 417 F.3d 379, 381 (3d Cir. 2005). "Adverse credibility determinations are factual findings subject to substantial evidence review." *Zheng*, 417 F.3d at 381; *Tarrawally v. Ashcroft*, 338 F.3d 180, 184 (3d Cir. 2003). We will defer to and uphold the IJ's adverse credibility determinations if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotations marks and citation omitted), but those findings must be based on inconsistencies and improbabilities that "involve the heart of the asylum claim." *Gao*, 299 F.3d at 272 (internal quotation marks and citation omitted).[8] "[D]eference is not due

_____

[8]The REAL ID Act of 2005 changed the standards governing credibility determinations, stating that those determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Pub. L. 109-13, div. B, § 101(a)(3), 119 Stat. 231, 303 (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). This provision, however, only applies to aliens who applied for asylum, withholding of removal, or other relief after May 11, 2005, the effective date of the Act. *See id*. § 101(h)(2), 119 Stat. at 305. As Xiao applied for asylum prior to that

where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record." *Balasubramanrim v. INS*, 143 F.3d 157, 162 (3d Cir. 1998) (internal quotation marks and citations omitted). "The internal consistency of a witness's testimony, its consistency with other testimony, its inherent (im)probability, as well as the witness's tone and demeanor[,] are important factors in determining credibility." *Chen v. Gonzales*, 434 F.3d 212, 220 (3d Cir. 2005). "An IJ must support his factual determinations with 'specific, cogent' reasons such that his conclusions 'flow in a reasoned way from the evidence of record and are [not] arbitrary and conjectural in nature.'" *Caushi v. Att'y Gen.*, 436 F.3d 220, 226 (3d Cir. 2006) (quoting *Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir.2003) (*en banc*)). The failure to do so "does not pass muster under the substantial evidence rubric." *Dia*, 353 F.3d at 254.

3.    *The Credibility Determination*

The IJ based his adverse credibility determination on four findings. Not one of them is supported by "cogent" reasoning grounded in the record.

(a)    *implausibility of testimony that home church could go undetected*

As noted, the IJ found Xiao's testimony not credible in part because it was impossible for him to believe that "a regime that is that brutally efficient would also be so utterly incompetent as not to close down a church that they [sic] already [knew] existed and in fact never even revisit that same location." This is pure speculation

---

date, this provision does not apply to our review of her claim.

13

unsupported by any evidence in the record. The record does not contain any information about the efficiency of the Chinese government or its ability to identify religious meetings of any size.

The Ninth Circuit Court of Appeals rejected an equally speculative – and, ironically, directly opposite – conclusion from an IJ in *Quan v. Gonzales*, 428 F.3d 883, 887 (9th Cir. 2005). There,

> the IJ found that Quan's testimony that her home was raided and she was arrested after participating in so few [Christian] meetings was not plausible. The IJ explained that ['][i]n a country the size of China, for a person to be so unlucky to have just joined a small group of seven or eight according to her testimony, conduct four secret meetings in homes not always her home, and then be arrested is highly improbable and at a minimum implausible.[']

428 F.3d at 887. "[T]his conclusion was not supported by the record," as "[a]n inference of a country's police capabilities cannot be drawn merely from its geographical size." *Id.*

In our case, the record before the IJ included the United States State Department's 2003 International Religious Freedom Report, which states that "an estimated 2.4 percent [of China's population] worship in Protestant house churches that are independent of government control." The report also notes that "prayer meetings and Bible study groups held in house churches are legal and generally are not subject to registration requirements so long as they remain small and unobtrusive." However, "[d]ue to a lack of transparent guidelines, local officials have great discretion in determining whether 'house churches' violate regulations," and "[u]nregistered religious groups continued to experience

14

varying degrees of official interference and harassment."  The IJ did not mention the report in articulating his incredulity at Xiao's contention that church members avoided detection by changing meeting times and locations; he simply found this was an "implausible" explanation.

"Official as well as unofficial country reports are probative evidence and can, by themselves, provide sufficient proof to sustain an alien's burden under the INA." *Zubeda*, 333 F.3d at 477; *see also Dia*, 353 F.3d at 246 (finding country report "important because the picture it paints provides a background against which to assess [the petitioner's] credibility").  "Reviewing courts have found it particularly troubling when immigration courts overlook country condition reports submitted by petitioners." *Chen v. Gonzales*, 417 F.3d 268, 272, 273 (2d Cir. 2005) (finding "significant error in the BIA's failure to consider the country condition report submitted by [the petitioner], which corroborates his testimony").  Likewise, "[t]he BIA has repeatedly emphasized the importance of providing background evidence concerning general country conditions, especially where it tends to confirm the specific details of the applicant's personal experience." *Diallo v. INS*, 232 F.3d 279, 288 (2d Cir. 2000).

The IJ based his conclusions regarding the plausibility of Xiao's testimony on his own assumptions about the enforcement priorities and capabilities of the Chinese authorities.  Not only did the IJ fail to tie his conclusions to any evidence in the record, they are at odds with information in the country report here.  "Where an IJ bases an

15

adverse credibility determination in part on 'implausibility' . . . [,] such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions." *Dia*, 353 F.3d at 249. Even under the substantial evidence standard of review, we need not extend deference where conclusions "are based on inferences or presumptions that are not reasonably grounded in the record." *Balasubramanrim*, 143 F.3d at 162 (internal quotation marks and citation omitted). In this context, the IJ's conclusion as to the implausibility of the non-detection of the home church falters.

> (b)     lack of eye-contact

The IJ's second ground for his adverse credibility determination was the "demeanor of the respondent," as he found her failure to make eye contact was a window to her untruthfulness. The IJ acknowledged "there are arguments that this Court has seen made that there are cultural things having to deal with eye contact and authority and so forth," yet he apparently rejected these arguments in favor of his own experience presiding over immigration cases. According to the IJ, "the Chinese people respond in this courtroom as all other nationalities . . . [.] [T]here's nothing else different about Chinese asylum applicants[,] whether they have to do with abortion, whether they have to do with religion or any other topic."

Demeanor is a legitimate and important factor in determining credibility. *Chen*, 434 F.3d at 220. Moreover, we extend an "even greater degree of deference" to an IJ's

16

observations of a petitioner's demeanor. *Dia*, 353 F.3d at 252 n.23. But the IJ's conclusion regarding demeanor in this case is not supported by "specific, cogent reason[s], but, instead, is based on speculation, conjecture, or an otherwise unsupported personal opinion." *Id*. at 250. It is not that an IJ could not properly, in some cases, draw an inference of incredibility from evasive eye contact; it is that the IJ here explicitly based his conclusion on his personal, unsubstantiated opinion that there are no cultural differences that would affect eye contact behavior. That he was aware of arguments to the contrary, yet preferred to adhere to his own theories, further reflects the speculative nature of his conclusions.

Indeed, "[e]ye contact patterns are . . . different in some Asian cultures, notably Japanese and Chinese, where avoiding eye contact is considered a sign of respect."[9] Paul R. Tremblay, *Interviewing and Counseling Across Cultures: Heuristics and Biases*, 9 CLINICAL L. REV. 373, 394 (2002). Unfortunately,

---

[9] Even assuming *arguendo* the presumed relationship between such demeanor and credibility in the usual context, . . . the relationship is often non-existent when the fact finder and witness are from different cultures. Thus, while the failure to look someone in the eye while speaking is usually interpreted as an indication of deception by people in Western cultures, avoiding eye contact has a very different meaning in some other cultures. . . . For example, in certain Asian cultures, avoiding eye contact is a sign of respect . . . .

*Dia*, 353 F.3d at 276 (McKee, J., concurring in part and dissenting in part).

17

[m]ost immigration judges have been raised in a culture where one is constantly exposed – either personally or via the media – to propositions such as, 'look me in the eye and say that,' reflecting the belief that eye-contact inhibits lying. However, the social significance of eye-contact, as well as expressions of emotions, vary from culture to culture, and as a result of their own cultural indoctrination, immigration judges may easily misconstrue asylum applicants' non-verbal behavior.

Joanna Ruppel, *The Need for a Benefit of the Doubt Standard in Credibility Evaluation of Asylum Applicants*, 23 COLUM. HUM. RTS. L. REV. 1, 12-13 (1992) (footnote omitted).

As these documents regarding Chinese habits of eye contact were not in the record, we do not cite them to "establish one way or the other whether [Chinese people have the same eye contact habits as all other people]. Rather, this information merely underscores our position that any finding on the question of the [eye contact] could only be based upon conjecture and speculation, impermissible bases under our controlling law." *Quan*, 428 F.3d at 888 n.5 (using publicly available information on bank hours in China to demonstrate that IJ's conclusion regarding typical hours of Chinese banks was based on conjecture).

### (c) lack of religious faith

The IJ did not credit Xiao's professed Christian faith on the general (and, here, "dime-store philosopher") ground that "[t]here are people who are knowledgeable about all sorts of things that they don't personally believe in." This falls significantly short of a "specific, cogent" reason for finding Xiao incredible. Even if we take the IJ's observation at face value, it provides no reason to distrust Xiao's claims of religious

18

belief.  We note that the IJ permitted questions regarding Xiao's knowledge of Christianity and did not himself ask a single question regarding her faith, as separate from her knowledge about that faith.  The Government did not cross-examine Xiao as to either her religious knowledge or her faith.

The Second Circuit Court of Appeals, in considering the adverse credibility determination of an IJ who had found a Chinese citizen's professions of Christian faith to be incredible, observed that

> where, as here, an IJ harbors nagging doubts about an applicant's credibility due to the spareness of his testimony, we have encouraged the IJ (along with the [G]overnment) to probe for incidental details, seeking to draw out inconsistencies that would support a finding of lack of credibility. During the asylum hearing in the case before us, the IJ asked no questions of Petitioner about his religious beliefs, and the [G]overnment decided not to conduct a cross-examination.  Nothing in the record suggests that Petitioner needed to present further evidence of his religious convictions, either to establish his eligibility for asylum, or to render his testimony more credible.

*Yang v. BIA*, 440 F.3d 72, 74 (2d Cir. 2006) (internal quotation marks, citation, and modification omitted); *see also Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 151 (2d Cir. 2003) ("a legal standard that empowers an IJ or the BIA to rule against a petitioner who fails to anticipate the particular set of details that the fact-finder desires (but does not request, through questions directed to the applicant) is no standard at all.").

Because the IJ did not seek testimony that would reveal Xiao's faith or the lack thereof, cite any example of the type of evidence he believed would support a finding on

19

this issue, or find fault with the religious testimony she did give, we can only conclude that his determination was not supported by substantial evidence.

### (d) absence of husband at hearing

The fourth and final reason for the IJ's adverse credibility determination was the failure of Xiao's husband, Chen, to attend the hearing, a factor described by the IJ as "a critical, not to be underestimated problem with this case." The Court concluded that Xiao and Chen were attempting to avoid being separated and having their testimony compared.

This conclusion is underwhelming at best. First, the relationship between Chen's decision not to attend the hearing and Xiao's credibility is no more than indirect: the connection to Xiao's credibility is more attenuated than would be, for example, inconsistencies within her testimony. The record contains a reasonable explanation for the Chen's failure to attend: he was afraid he would be arrested due to his own unstable immigrant status. It is true that the IJ advised the parties that Chen was to attend the hearing, and we can assume the IJ was correct that there was "no serious possibility" that the husband would be arrested. Yet, it is still plausible that Chen (incorrectly) believed that he could be arrested at the hearing, and his failure to attend can be explained by his own ignorance or concern, rather than by a desire to avoid revealing falsehoods in Xiao's testimony.

Second, the IJ ignored Chen's statement in the record that does, in fact, support

20

Xiao's testimony.  (Neither does the IJ mention the statements in the record from Xiao's mother-in-law, her sister, her church friend, and her uncle – all of which support her testimony.)

Third, our conclusion above that the IJ inappropriately speculated as to the enforcement capabilities of the Chinese authorities undermines the IJ's stated reason for needing testimony from Chen.  The IJ stated:

> The Court has already raised the problem with the respondent's religious persecution claim, specifically there is the problem of having this church exist for a period of several years when the church had already been raided by the police.  Had the respondent's husband been her[e], he could have testified and perhaps swayed the Court of its concerns with regard to this question.

The IJ did not mention any other specific reasons for needing testimony from Chen, or areas of Xiao's testimony that required corroboration.  Because we conclude that Xiao's testimony about her church attendance is, in fact, supported by the record, the need for corroborating testimony is accordingly less acute.

Fourth and finally, it is not clear why the absence of Xiao's husband's specific corroborating information serves to undercut the credibility of her testimony rather than merely affecting the sufficiency of the evidence she has presented.  As our Court has observed,

> [i]t might seem intuitive that a lack of corroboration could cast doubt on the veracity of a witness's testimony, even a witness whose story was delivered with an appealing demeanor, internally consistent, and not inherently improbable. . . . However, it is clear that the BIA's own rule requires a credibility determination to be independent of an analysis of the sufficiency of an applicant's evidence.

21

*Chen*, 434 F.3d at 221 (observing that "[t]he IJ seems to have impermissibly blurred the line between the credibility of a claimant and the adequacy of proof to support the claim of asylum."). Here the IJ seems to have made the same mistake.

We need not determine, however, whether the IJ's conclusions regarding Chen's failure to appear are supported by substantial evidence, as the other three bases for the adverse credibility determination fail, and Chen's absence alone is insufficient to support the finding of incredibility. We therefore hold that the IJ's adverse credibility determination is not supported by substantial evidence.

### 4.    *The Persecution Determination*

As stated above, the IJ found Xiao had demonstrated neither past persecution nor a well-founded fear of future persecution because there is no evidence of a pattern or practice of persecution of Christians by the Chinese government, Xiao's single arrest cannot pass as persecution nor can the mandatory gynecological exams, and there is no evidence to support Xiao's testimony that she will suffer negative repercussions upon her return to China as a result of having left the country "illegally."[10]

But even if there is substantial evidence to support the IJ's conclusions that Xiao

---

[10] Regarding Xiao's claim that persecution was more likely in light of her illegal exit from China, the IJ questioned the "illegal" nature of her exit and noted that this is not a protected ground relevant to asylum. Even if we assume that Xiao's exit from China was "illegal," we need not decide here whether it alone is sufficient to support an asylum claim. As a remand is warranted on other grounds, we do not consider Xiao's manner of exit.

did not (a) suffer past persecution on account of religion, (b) have a well-founded fear of future religious persecution, or (c) suffer past persecution on account of her resistance to birth control policies, we conclude that a remand is required on the question of whether Xiao has a well-founded fear of future persecution because of her resistance to China's family planning policies. The IJ failed to discuss this issue; however, it was considered and rejected by the BIA in connection with Xiao's motion to remand. We accordingly analyze the question of Xiao's fear of future persecution on political grounds in the context of the BIA's denial of the motion to remand.

"We treat the motion styled as a 'motion to remand' as a motion to reopen since it requires reopening the proceedings." *Shardar*, 382 F.3d at 325 n.4. "We review the BIA's denial of the motion to reopen [or remand] for abuse of discretion." *Id.* at 324 (internal quotation marks and citation omitted). Under this standard, "the [BIA's] decision must be reversed if it is . . . contrary to law," and "we must also ask whether the [BIA] followed proper procedures and considered and appraised the material evidence before it." *Sevoian v. Ashcroft*, 290 F.3d 166, 174, 177 (3d Cir. 2002) (internal quotation marks, citations and modifications omitted).

"A motion to reopen must establish *prima facie* eligibility for asylum." *Guo v. Ashcroft*, 386 F.3d 556, 563 (3d Cir. 2004) (citing *Sevoian*, 290 F.3d at 173). This standard requires a petitioner to "produce objective evidence showing a reasonable likelihood that he can establish that he is entitled to relief. *Id.* (internal quotation marks,

23

modifications, and citations omitted).  At the motion to reopen stage, "[a] 'reasonable likelihood' means merely showing a *realistic chance* that the petitioner can at a later time establish that asylum should be granted." *Id.* at 564 (emphasis added).[11]  This does not mean that an applicant gets a second chance to establish what was unsuccessful initially, but rather that s/he will have an opportunity to show additional evidence that was unavailable at the first hearing.

Here, the BIA denied Xiao's motion to remand because it could simply

> not conclude based on the evidence of record that the respondent has a well-founded fear of persecution because she may now be considered in violation of the population control law.  It is unclear whether the United States citizen children will actually return to China with the respondent.  There is also insufficient documentary evidence of record to convince the Board that there is any likelihood that the respondent will be sterilized.

This language implies that the BIA was requiring that Xiao establish a well-founded fear, rather than a "realistic chance" that she could establish such a fear at a later time. *See id.* at 564.  "The distinction may at first appear to be subtle shading, but without it '*prima facie*' (meaning at first sight) would lack meaning." *Id.*

Furthermore, the BIA's comment regarding the possibility that Xiao's children might not return to China with her was an inappropriate and insufficient ground for

---

[11] Guo's use of "realistic chance" was not intended to cut back on <u>Sevoian</u>'s "reasonable likelihood" test, but simply to explain that the latter does not require one seeking reopening to show at the time of the motion to reopen that "the evidence for asylum outweighs the evidence against." <u>Id</u>.; *see also Poradisova v. Gonzales*, 420 F.3d 70, 78 (2d Cir. 2005).]

denial. First, "the break-up of a family. . . [is] a result that is at odds . . . . with significant parts of our overall immigration policy." *Ma v. Ashcroft*, 361 F.3d 553, 561 (9th Cir. 2004). Second, the BIA's suggestion that Xiao might abandon her children implies that any asylum applicant who has been persecuted, but can abandon the opinion or association giving rise to the persecution, should do so – an outcome that is also at odds with the objectives of United States asylum law. Finally, there is no support in the record for the contention that Xiao might abandon her children to return to China. It is not clear how much of the BIA's holding rested on this wayward comment and thus unclear how much the BIA's overall conclusions are undermined by our rejection of this rationale.

Because the BIA failed to apply the proper evidentiary standard, and denied the motion at least in part on an impermissible conclusion about Xiao's ability to return to China without her children, we remand this case to allow it to determine whether Xiao has established a *prima facie* case of a well-founded fear of future persecution on account of her political opinion, namely her resistance to China's population control policies.

The BIA's analysis should be conducted in light of our caselaw and any additional evidence Xiao can produce on remand, and without reference to the prior adverse credibility finding. We also encourage it to consider the 2005 Country Report on remand. *Caushi*, 436 F.3d at 231 n.6 (noting that our Court has described country reports as "the most appropriate and perhaps best resource on country conditions") (internal quotation

25

marks and citation omitted).  If the BIA, applying the proper evidentiary standard, determines that Xiao states a *prima facie* case, it may then remand the matter to an IJ for a hearing.

B.    CAT relief

The CAT has been implemented by regulations codified at 8 C.F.R. §§ 208.16 and 208.18, which require withholding of removal for an alien who can show that it is more likely than not that she, upon removal to a particular country, will be tortured by, or with the acquiescence of, its government.  *Abdulrahman v. Ashcroft*, 330 F.3d 587, 591 n.2 (3d Cir. 2003).  "The standard for relief has no subjective component, but instead requires the alien to establish . . . by objective evidence that [s]he is entitled to relief." *Sevoian*, 290 F.3d at 175 (internal quotation marks and citations omitted).

A claim for relief under the CAT is "analytically separate" from both asylum and withholding of removal under the INA.  *Zubeda*, 333 F.3d at 476.  As such, an adverse credibility finding for purposes of denying asylum and withholding of removal claims does not preclude a petitioner from establishing a claim for relief under the CAT.  *Id*. Similarly, "a decision-maker must review claims for relief under the Convention and consider relevant country conditions even where adverse credibility determinations have precluded relief under the INA."  *Tarrawally*, 338 F.3d at 188.

Here the IJ issued an order that, among other things, denied Xiao's application for protection under the CAT.  Yet he did not mention the Convention or torture at any point

26

in his oral opinion. Likewise, the BIA did not mention the CAT claim in its affirmance of the IJ's opinion. It is true that "[t]he Board is not required to write an exegesis on every contention, but only to show that it has reviewed the record and grasped the movant's claims." *Sevoian*, 290 F.3d at 178 (internal quotation marks and citations omitted). As stated above, however, IJs and the BIA are required to review claims for relief under the CAT "even where adverse credibility determinations have precluded relief under the INA." *Tarrawally*, 338 F.3d at 188. It was therefore error for the IJ to dismiss Xiao's CAT claim on the basis of the adverse credibility finding made in relation to her application for asylum.

Yet notwithstanding such an error, remand is unnecessary if the record does not support a petitioner's claim for relief under the CAT. *Mahmood*, 427 F.3d at 253; *Zubeda*, 333 F.3d at 465 n.1. A CAT claim requires a both a likelihood and severity of harm that is simply not implicated by the record before us. We accordingly deny Xiao's claim for relief under the CAT.

\* \* \* \* \*

We deny Xiao's petition as to the CAT claim, but remand her claims for asylum and withholding of removal.

27