

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-11-2007

# Jarbough v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-1081

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Jarbough v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1165.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1165

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-1081
_____

ADEL FADLALA JARBOUGH,

Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES.

_____

On Review of a Decision of the
Board of Immigration Appeals
(Agency No. A79 138 652)
Immigration Judge: R.K. Malloy

Submitted pursuant to Third Circuit LAR 34.1(a)
January 25, 2007

Before: SCIRICA, <u>Chief</u> <u>Judge</u>, FUENTES and CHAGARES,
<u>Circuit</u> <u>Judges</u>.

(Filed: April 11, 2007)

Marc J. Reiter
Suite 600
312 Boulevard of the Allies
Pittsburgh, PA 15222

<u>Counsel for Petitioner</u>
<u>Adel Fadlala Jarbough</u>

Richard M. Evans
Joan E. Smiley
Genevieve Holm
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Counsel for Respondent
Attorney General of the United States

OPINION OF THE COURT

CHAGARES, Circuit Judge.

Adel Jarbough petitions for review of a final order of removal issued by the Board of Immigration Appeals ("BIA"). As explained below, we lack jurisdiction to review Jarbough's claim that extraordinary circumstances excused the late filing of his asylum application. In addition, substantial evidence supports the BIA's denial of withholding of removal, and the Immigration Judge's ("IJ") rulings and conduct did not violate the Due Process Clause. Accordingly, we will dismiss the petition for review in part, and deny it in part.

I.

Mr. Jarbough is a native and citizen of Syria. In March 2001, he entered the United States as a non-immigrant authorized to remain until June of that year. Jarbough overstayed his visa, and in December 2002 he filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] Jarbough claimed to have suffered persecution in Syria

_____

[1]United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10,

2

on account of his being a Druze,[2] and on account of a pro-Israeli political opinion imputed to him by the Syrian government.

Jarbough conceded that he filed his asylum application more than one year after his arrival in the United States. However, he claimed that extraordinary circumstances excused the delay. See 8 U.S.C. § 1158(a)(2)(B), (D). Specifically, in May 2001, Jarbough consulted with an attorney (not counsel in the present appeal). Jarbough described his troubles in Syria, and the attorney opined that Jarbough had little hope of winning asylum. When the meeting ended, the men went their separate ways. Critically, though, the attorney neglected to mention the one-year deadline for filing an asylum application. According to Jarbough, this negligent omission was an extraordinary circumstance capable of tolling the one-year deadline.

As to the merits, Jarbough styled his application as a "mixed motives" case. See Singh v. Gonzales, 406 F.3d 191, 197 (3d Cir. 2005). He claimed that the Syrian government's decision to persecute him resulted from a number of factors. First and foremost, he was a Druze. Jarbough claimed that the Syrian government has traditionally suspected the Druze of collaborating with the Israelis. Second, Jarbough had served in the Syrian military and worked as a civilian employee of the Ministry of Defense. Third, he had been in communication with his uncle, a resident of the Israeli-controlled Golan Heights. In early 2001, Jarbough's uncle visited his family in Syria for the first time since the 1967 Six-Day War. Jarbough and his uncle subsequently spent two days together. This apparently raised the suspicions of the Syrian intelligence authorities. Jarbough claimed that these authorities believed he was an Israeli spy and, for that, they

---

1984, 1465 U.N.T.S. 85, implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761 (codified at 8 U.S.C. § 1231).

[2]The Druze religion grew out of Shia Islam and was founded in the eleventh century. Its adherents are primarily concentrated in Lebanon, Syria, and Israel. See generally Salman Falah, The Druze in the Middle East 1-4 (2002).

3

persecuted him.

A few weeks after the visit from Jarbough's uncle, Syrian intelligence officers seized Jarbough from his home and took him to their facility. The officers placed Jarbough in an interrogation room that contained wires and electrical cables. They told Jarbough, "[I]f you don't tell the truth . . . you will have [the] feel of it." Appendix ("App.") 192. Although the officers did not use the electrical devices, they repeatedly screamed at Jarbough and jabbed their fingers and fists into his shoulder. After four hours of interrogation, they released him.

Ten days later, the authorities seized Jarbough again. This time he remained in their custody for two days. Once again, the officers cursed and screamed, yelling, "You are a spy, all of you are." App. 210. In the interrogation room, Jarbough saw electric-shock machines that looked similar to torture devices he had seen on television. The officers did not use the devices, but they did administer a series of kicks, shoves, and pushes. After two days, the officers released Jarbough and told him to remain in his house. Jarbough had some bruises, but he did not go to a doctor because his injuries "did not really require immediate medical intervention." App. 258. Shortly thereafter, he left for the United States.

Jarbough recounted these tribulations at an August 2004 hearing before an IJ. At the beginning of the hearing, Jarbough's attorney asked for a continuance. He wanted a delay to secure the expert testimony of Professor Joshua Landis, a scholar well-versed in the historical plight of the Syrian Druze. The IJ responded that she was "finishing th[e] case today." App. 137. Her next available hearing date was in April 2005, and she viewed an eight-month delay as unacceptable. Rebuffed, Jarbough's attorney instead submitted an article by Professor Landis. See Joshua Landis, Shishakli and the Druzes: Integration and Intransigence, in The Syrian Land: Processes of Integration and Fragmentation 369 (T. Philipp & B. Schaebler eds., 1998), reprinted in App. 515-37. The IJ stated that she would "certainly take note of th[e] article." App. 142.

Jarbough's attorney also sought to introduce the testimony

4

of Norris El-Attrache.  Like Jarbough, El-Attrache is a Syrian Druze.  He was prepared to describe the Syrian government's persecution of his family.  According to counsel, this evidence would show "that people similarly situated to [Jarbough] have disappeared and/or are being killed based on the fact that they are [D]ruze."  App. 136.  The IJ refused to allow it.  She reasoned that El-Attrache's testimony would effectively require her to "entertain . . . 2 asylum applications."  App. 136.  Nonetheless, Jarbough's counsel did submit an affidavit from El-Attrache.  In it, El-Attrache spoke generally about the Druze religion, discussed the persecution of the Druze by the Syrian government, and stated that "on Feb[ruary] 4, 1954, [his] father was killed in battle with the Syrian army."  App. 682-83.

With these preliminary considerations disposed of, Jarbough took the stand and testified.  During the hearing, the IJ repeatedly sustained objections that Jarbough's counsel was asking leading questions.  At one point, there occurred a rather testy exchange between the IJ and Jarbough's attorney.  Jarbough was describing the cables he had seen in the intelligence facility's interrogation room.  Counsel asked, "What kind of cables were these?"  App. 193.  At this point, the Department of Homeland Security's attorney objected on relevance grounds.  Jarbough's attorney responded, "They're electrical cables."  Id.  Moments later, Jarbough parroted, "Electrical cables."  Id.  This angered the IJ.  She scolded Jarbough's attorney and admonished him to "[s]top giving the answers."  App. 194-98.

Jarbough's testimony continued.  The next day, the IJ heard closing arguments and rendered an oral decision.  She concluded that no extraordinary circumstances excused Jarbough's failure to comply with the one-year deadline.  In the alternative, she found that Jarbough had not established eligibility for asylum.  The IJ also found him ineligible for withholding of removal and CAT relief.

On appeal, the BIA affirmed.  It adopted most of the IJ's findings and added a few thoughts of its own.  Specifically, it explained in greater detail why the omission by the attorney Jarbough visited did not constitute an extraordinary circumstance.

5

This petition for review followed. Jarbough challenges the BIA's rejection of his asylum application as untimely, its denial of withholding of removal, and he also contends that several of the IJ's rulings as well as her conduct violated the Due Process Clause.

II.

We consider first Jarbough's claim that extraordinary circumstances excused the late filing of his asylum application. Under 8 U.S.C. § 1158(a)(2)(B), an alien must file an asylum application within one year of his arrival in the United States. A late-filed application may be excused if the alien demonstrates "to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application . . . ." 8 U.S.C. § 1158(a)(2)(D). Immediately after that provision, paragraph (a)(3) states that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." 8 U.S.C. § 1158(a)(3). Accordingly, in Tarrawally v. Ashcroft, 338 F.3d 180 (3d Cir. 2003), we held that § 1158(a)(3) stripped us of jurisdiction to review a "determination that an asylum petition was not filed within the one year limitations period, and that such period was not tolled by extraordinary circumstances." Id. at 185.

After Tarrawally, however, Congress enacted the REAL ID Act of 2005. Section 106 of the REAL ID Act restored our jurisdiction to review "constitutional claims or questions of law raised upon a petition for review . . . ." REAL ID Act of 2005 § 106(a)(1)(A)(iii), 8 U.S.C. § 1252(a)(2)(D).[3]

The jurisdictional grant of § 1252(a)(2)(D) is narrowly circumscribed. See Saloum v. U.S. Citizenship & Immig. Servs., 437 F.3d 238, 242-43 (2d Cir. 2006); Higuit v. Gonzales, 433 F.3d 417, 419 (4th Cir. 2006). For instance, it is clear that courts of appeals continue to have no jurisdiction to review discretionary and factual determinations presented in petitions for review. See, e.g.,

---

[3]We have jurisdiction to determine whether we have jurisdiction. United States v. Ruiz, 536 U.S. 622, 628 (2002).

6

Diallo v. Gonzales, 447 F.3d 1274, 1281 (10th Cir. 2006); Jean v. Gonzales, 435 F.3d 475, 480 (4th Cir. 2006); Sukwanputra v. Gonzales, 434 F.3d 627, 634 (3d Cir. 2006) ("Despite the special treatment accorded constitutional claims and questions of law, § 1252(a)(2)(D) does not exempt factual or discretionary challenges from the jurisdiction-stripping provisions of the INA."); Mehilli v. Gonzales, 433 F.3d 86, 93 (1st Cir. 2005); Vasile v. Gonzales, 417 F.3d 766, 768 (7th Cir. 2005).

In Sukwanputra, the petitioners claimed they had presented a question of law as to whether they were entitled to an extension under § 1158(a)(2)(D). We recognized in that case that petitioners were, in fact, challenging an exercise of discretion and noted "[s]uch a claim does not raise a constitutional claim or question of law covered by the REAL ID Act's judicial review provision." 434 F.3d at 635. We concluded "that, despite the changes of the REAL ID Act, . . . § 1158(a)(3) continues to divest [us] of jurisdiction to review . . . whether an alien established changed or extraordinary circumstances that would excuse his untimely filing." Id.

Our decision in Sukwanputra is in accord with the decisions of other courts holding that challenges to the BIA's extraordinary or changed circumstances determinations do not constitute "questions of law" within the meaning of § 1252(a)(2)(D). See, e.g., Ignatova v. Gonzales, 430 F.3d 1209, 1214 (8th Cir. 2005); Chacon-Botero v. U.S. Attorney Gen., 427 F.3d 954, 957 (11th Cir. 2005); Vasile, 417 F.3d at 768. Specifically, courts have recognized arguments such as that an Immigration Judge or the BIA incorrectly weighed evidence, failed to consider evidence or improperly weighed equitable factors are not questions of law under § 1252(a)(2)(D). See, e.g., Bugayong v. Immigration & Nat. Serv., 442 F.3d 67, 71-72 (2d Cir. 2006); Elysee v. Gonzales, 437 F.3d 221, 223-24 (1st Cir. 2006); Higuit, 433 F.3d at 420. In contrast, we have recognized that § 1252(a)(2)(D) confers upon us jurisdiction over purely legal questions such as whether a particular offense qualifies as an aggravated felony under the definition set forth in 8 U.S.C. § 1101(a)(43). See Jeune v. Attorney General, 476 F.3d 199, 201 (3d Cir. 2007); Park v. Attorney General, 472 F.3d 66, 70 (3d Cir. 2006); Bobb v. Attorney General, 458 F.3d 213, 217 (3d Cir. 2006); Ng v. Attorney General, 436 F.3d 392, 394-95 (3d Cir. 2006) (whether a crime falls within §

7

1101(a)(43)(F) is "a question of pure statutory interpretation.").

Petitioners alleging "constitutional claims" under § 1252(a)(2)(D) must, as a threshold, state a colorable violation of the United States Constitution. See Mehilli, 433 F.3d at 94; Martinez-Rosas v. Gonzales, 424 F.3d 926, 930 (9th Cir. 2005). In the present case, Jarbough claims that the extraordinary circumstances analyses of the IJ and the BIA ignored certain evidence and contained "clear factual mistakes" that resulted in "a denial of due process." See Jarbough Brief 15-16. On that basis, he asserts that we have jurisdiction to review his "constitutional claim[]."

We are not bound by the label attached by a party to characterize a claim and will look beyond the label to analyze the substance of a claim. To do otherwise would elevate form over substance and would put a premium on artful labeling. See New Jersey v. Dep't of Health & Human Servs., 670 F.2d 1262, 1272 (3d Cir. 1981). Accordingly, artful labeling will not confer us with jurisdiction. See Avendano-Espejo v. Dep't of Homeland Sec., 448 F.3d 503, 505-06 (2d Cir. 2006) (per curiam) ("[P]etitioner's attempt to 'dress up' his challenge with the language of 'due process' is insufficient to provide our Court with jurisdiction to review his claim . . . ."); Saloum, 437 F.3d at 243 ("[W]e [do not] believe that Saloum's talismanic invocation of the language of 'due process' itself suffices to provide this Court with jurisdiction to review petitioner's claims.").

Aside from the constitutional label, Jarbough makes no attempt to tie his claim of factual errors to the Due Process Clause. At the core of due process are the requirements of notice and a meaningful opportunity to be heard. See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). Jarbough does not argue that the agency denied him notice, a reasonable opportunity to present evidence, disclosure of fact finding or an individualized determination on the extraordinary circumstances issue. See Mudric v. Attorney General, 469 F.3d 94, 100 (3d Cir. 2006). His only claim is that the IJ and the BIA got the facts wrong, and that these erroneous findings of fact deprived him of due process.

Jarbough has failed to state a colorable violation of the

8

Constitution. He has simply taken his naked factual challenges and clothed them in the garb of due process. Recasting challenges to factual or discretionary determinations as due process or other constitutional claims is clearly insufficient to give this Court jurisdiction under § 1258(a)(2)(D). Our holding in this respect is in accord with the decisions of the other courts of appeals that have rejected similar challenges labeled as due process claims. See, e.g., Avendano-Espejo, 448 F.3d at 505-06 (no jurisdiction over argument that IJ employed an erroneous legal standard); Saloum, 437 F.3d at 244 (no jurisdiction over arguments that IJ failed to consider certain evidence, incorrectly weighed the evidence and reached the wrong outcome); Mehilli, 433 F.3d at 94 (arguments that IJ incorrectly weighed the evidence and failed to consider certain evidence regarding credibility "fail[ed] to state a colorable constitutional claim . . . . [S]uch arguments are not properly viewed as constitutional challenges at all, but instead as simple claims that substantial evidence did not support the IJ's credibility finding."); Martinez-Rosas, 424 F.3d at 930 (no jurisdiction over argument that IJ misapplied the facts to the applicable law, noting "traditional abuse of discretion challenges recast as alleged due process violations do not constitute colorable constitutional claims").

Section 1158(a)(3) explicitly prohibits judicial review of the discretionary authority committed to the Executive Branch under § 1158(a)(2)(D). The REAL ID Act of 2005 created a narrow exception to this prohibition to permit judicial review over constitutional claims and questions of law raised in petitions for review. If we were to review a claim merely because it was adorned with the label "constitutional claim" or "question of law," we would overstep our authority and frustrate Congress' statutory design. This we cannot do.

Garden-variety allegations of factual error such as those presented here provide no colorable basis for a constitutional challenge, and Jarbough's due process label is insufficient to shield him from the strictures of § 1158(a)(3). We therefore lack jurisdiction to review the BIA's extraordinary circumstances determination.

III.

9

We do have jurisdiction to review the denial of withholding of removal.  See Tarrawally, 338 F.3d at 185-86.  Under 8 U.S.C. § 1231(b)(3)(A), "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion."  It is the applicant's burden to establish the threat to life or freedom by a "clear probability."  Tarrawally, 338 F.3d at 186; 8 C.F.R. § 1208.16(b).  This standard is satisfied if the "evidence establish[es] that it is more likely than not that the alien would be subject to persecution on one of the specified grounds."  See INS v. Stevic, 467 U.S. 407, 429-30 (1984).  A finding of past persecution raises a rebuttable presumption "that the applicant's life or freedom would be threatened in the future . . . ."  8 C.F.R. § 1208.16(b)(1)(i); see Gabuniya v. Attorney General, 463 F.3d 316, 321 (3d Cir. 2006).

Whether an applicant "has demonstrated past persecution . . . is a factual determination reviewed under the substantial evidence standard."  Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).  Accordingly, "we may decline to uphold the BIA's findings only if the evidence compels a contrary conclusion."  Ahmed v. Ashcroft, 341 F.3d 214, 216 (3d Cir. 2003).

Jarbough claims that the Syrian government persecuted him because he is a Druze, and because it believed he held a pro-Israeli political opinion.  The IJ rejected these contentions.  The BIA largely adopted the IJ's findings and added a few reasons of its own.  We thus review both the BIA's decision and the IJ's opinion to the extent the BIA adopted it.  See Miah v. Ashcroft, 346 F.3d 434, 439 (3d Cir. 2003).

At the outset, Jarbough challenges the IJ's adverse-credibility determination.  The Attorney General, however, disputes this argument's premise.  See Attorney General Brief 22 ("[T]he immigration judge did not make an adverse credibility finding.").  Contrary to the Attorney General's assertion, it seems clear to us that the IJ made at least a partial adverse-credibility determination.  See App. 89 ("The Court finds that testimony to be incredible.").  But the BIA did not explicitly adopt the IJ's credibility findings, so that portion of her decision is not properly before us.  Abdulai v. Ashcroft, 239 F.3d 542, 549 n.2 (3d Cir.

10

2001). We will therefore assume Jarbough was credible for purposes of this petition.

Jarbough also challenges the BIA's determination that his troubles in Syria did not rise to the level of persecution. Persecution "is an extreme concept that does not include every sort of treatment our society regards as offensive." Fatin v. INS, 12 F.3d 1233, 1243 (3d Cir. 1993). Abusive treatment and harassment, while always deplorable, may not rise to the level of persecution.

Here, Jarbough testified that Syrian intelligence officers seized him on two occasions. The first time, the officers placed Jarbough in an interrogation room for four hours. They threatened him with wires and electrical cables, screamed at him, and jabbed his shoulder with their fists. The second time, the officers confined Jarbough for two days. They cursed, threatened, kicked, shoved, and pushed him. As a result of this abuse, Jarbough suffered bruising. He did not go to a doctor, however, as his injuries did not "require immediate medical intervention." App. 258.

There is no doubt that the officers' behavior was harassing and intimidating. Our society rightly regards their investigative tactics as "offensive" and highly improper. See Fatin, 12 F.3d at 1243. Indeed, under a de novo standard of review, we might well disagree with the agency's conclusion that Jarbough failed to show past persecution. But we are not triers of fact, and Congress mandates that we leave the agency's factfinding undisturbed unless the "evidence compels a contrary conclusion." Ahmed, 341 F.3d at 216 (emphasis added). Under that deferential standard of review, we cannot say this record compels a finding of past persecution for purposes of withholding of removal. As a result, we must hold that substantial evidence supports the BIA's denial of withholding of removal.

IV.

Jarbough also brings a variety of due process challenges to the IJ's conduct at the hearing. Aliens have a "right to a full and fair hearing that allows them a reasonable opportunity to present evidence on their behalf." Cabrera-Perez v. Gonzales, 456 F.3d

11

109, 115 (3d Cir. 2006). To prevail on a due process claim, the "alien must show substantial prejudice." See Singh v. Gonzales, 432 F.3d 533, 541 (3d Cir. 2006).

First, Jarbough challenges the IJ's refusal to grant a continuance. Jarbough asked for a delay to secure the testimony of Joshua Landis. In our view, the denial did not prevent Jarbough "from reasonably presenting his case." See Uspango v. Ashcroft, 289 F.3d 226, 231 (3d Cir. 2002) (quotations and citations omitted). The record contains a lengthy article by Mr. Landis, see App. 515-37, and Jarbough does not argue that Landis' in-court testimony would have materially differed from his written work. As such, we conclude that the IJ's denial of a continuance did not deprive Jarbough of due process.

Second, Jarbough argues that the IJ improperly excluded the testimony of Norris El-Attrache. Again, we fail to see how this exclusion denied Jarbough a "reasonable opportunity to present evidence." See Cabrera-Perez, 456 F.3d at 115. The record contains an affidavit by Mr. El-Attrache. Jarbough does not explain whether or how El-Attrache would have expanded on this account at the hearing. With El-Attrache's story already in the record, the IJ's exclusion of the testimony was not a due process violation. See Romanishyn v. Attorney General, 455 F.3d 175, 185-86 & n.10 (3d Cir. 2006).

Third, Jarbough contends that the IJ's hostility toward his attorney "curtailed . . . counsel's ability to ask questions, and . . . unduly prevented [Jarbough] from providing testimony." Jarbough Brief 29. It is clear from the record that Jarbough's counsel repeatedly asked Jarbough leading questions and that the IJ repeatedly admonished him not to do so. See, e.g., App. 161-62 ("Why do you insist on testifying for your client?"); id. 81 ("[P]lease ask questions that are not leading.").

Jarbough relies upon one particular exchange in support of his argument. After asking Jarbough about the type of cables at the Syrian intelligence facility, counsel stated the answer to his own question: "They're electrical cables." App. 193. The IJ became angry and instructed counsel at length about the impropriety of his behavior.

12

When an attorney poses questions to a friendly witness during a direct examination, it is generally improper for the attorney to employ leading questions. Cf. Fed. R. Evid. 611(c). Leading questions are undesirable in this context because of their suggestive power. The "search for the truth," Nix v. Whiteside, 475 U.S. 157, 171 (1986), in our adjudicatory system is best served when the finder of fact considers the testimony of the friendly witness based upon his or her recollection, not the testimony of counsel calling the witness. Suggesting answers to the friendly witness may "supply a false memory for the witness – that is, to suggest desired answers not in truth based upon real recollection." 3 John Henry Wigmore, Evidence § 769, at 154 (Chadbourne Rev. 1970). See Hall v. Clifton Precision, 150 F.R.D. 525, 531 (E.D. Pa. 1993) ("It should go without saying that lawyers are strictly prohibited from making any comments, either on or off the record, which might suggest or limit a witness's answer to an unobjectionable question.").

In this case, Jarbough's attorney did not just ask a leading question regarding the cables; he announced the expected answer to his question. In this instance, it was clear that it was the attorney who was testifying. There was nothing erroneous (much less unconstitutional) about the IJ's actions. The IJ's rebuke did not "unduly prevent[] [Jarbough] from providing testimony"; it prevented his lawyer from testifying for him.

In sum, none of the IJ's rulings or conduct deprived Jarbough of the process he was constitutionally due.

V.

For these reasons, we will dismiss the petition for review in part, and deny it in part.

13