**PHIK HA LIE; Pek Siong Lo, Petitioners**

v.

**ATTORNEY GENERAL OF the UNITED STATES; Secretary of Department of Homeland Security.**

No. 06–3496.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Sept. 28, 2007.

Filed: Oct. 9, 2007.

Joseph C. Hohenstein, Orlow & Orlow, Philadelphia, PA, for Petitioners.

Richard M. Evans, Richard M. Evans, Andrew Oliveira, United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: McKEE, BARRY, and FISHER, Circuit Judges.

## OPINION

BARRY, Circuit Judge.

Petitioners seek review of a decision of the Board of Immigration Appeals ("BIA") dismissing their appeal from an Immigration Judge's ("IJ") decision to deny their applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). For the reasons that follow, we will the deny the petition.

## I.

Petitioners Phik Ha Lie and Pek Siong Lo are wife and husband, respectively, who legally entered the United States from Indonesia on May 27, 2000. They overstayed their visas and, on July 30, 2001, filed an application for asylum and withholding of removal on the basis of alleged persecution due to their Chinese ethnicity and Christian religion. Removability is conceded.

As part of the application for asylum, Lie submitted an affidavit, dated May 1, 2001, describing several "mistreatments" that she experienced from native Indonesians. She cited anti-Chinese riots in 1966 that forced her parents to sell their shop and move to a new location, as well as rioting in 1998 that was directed toward Chinese shop owners and citizens. Lie also described two occasions on which her husband was robbed. On the first occasion, a native Indonesian armed with a knife approached Lo in a train station and stated, "Chink, your life is worthless, give me all you have or I will stab you." (A.R. 631.) The second robbery occurred when Lo was delivering goods to a location outside of town and three native Indonesians armed with "sharp weapons" robbed him of his car radio. (A.R. at 632.) Finally, Lie claimed that around April 2000, her

nephew was beaten by native Indonesians and robbed of his car.

In advance of the asylum hearing, Lie filed a second affidavit, dated February 17, 2004, "to correct errors and omissions" in her previous affidavit. (A.R.619.) She now claimed that her father's store was "burned to the ground" in the 1966 riots, and that her husband's store was vandalized and her husband and son beaten during the 1998 riots. (Id.) For the first time, she stated that in November 1998 she successfully converted a Muslim woman named Endang Sri Rejeki to Christianity, and that Rejeki's immediate family converted soon thereafter. Lie stated that Rejeki, who "faced much criticism" for her conversion, warned Lie not to let others know that she was converting Muslims because her life would be in danger. (Id.) She also claimed that on July 12, 1998, a group of Muslims confronted her and her daughter on their way to church. The Muslims allegedly slapped Lie, threw her Bible to the ground, and threatened to kill her if she continued to go to church. Finally, she stated that in 1999 her son and nephew each were beaten by Muslims, and that in 2001 her church received a bomb threat.

The IJ held an asylum hearing on March 4, 2005.[1] Lie testified that she is a citizen of Indonesia who is of Chinese ethnicity and a Pentecostal Christian. As in her second affidavit, Lie testified that in 1966, her father's store was "burned to the ground" by rioting Muslims. (A.R. at 244.) She also testified that she was active in evangelizing and converted Rejeki, her Muslim neighbor, and Rejeki's family to Christianity. She testified that Rejeki had "received some criticism" and "heard some threats" toward Lie for Rejeki's conversion. (A.R. at 248.) Lie described walking to church with her daughter on July 12, 1998, and encountering a group of Muslims, who slapped her, threw her Bible to the ground, and threatened to kill her if she continued to attend church. She also testified that her son and nephew suffered beatings at the hands of Muslims, and that her church received a bomb threat in 2001.

Lo testified that he, like his wife, was of Chinese ethnicity and a Pentecostal Christian. He stated that on May 15, 1998, ten Muslims entered his store, shouted an ethnic slur, and beat him and his son with iron bars. When asked why his son, in a supporting affidavit submitted from Indonesia, did not mention being beaten in the store, Lo stated that his son simply "forgot." (A.R. at 271.) Apart from being mocked by natives, the only other incident that Lo could recall was an occasion when three men robbed him of his wristwatch and wallet as he was riding his motorcycle.

At the close of the hearing, the IJ issued an oral decision. She found that Petitioners' application for asylum was untimely, and that Petitioners failed to establish the extraordinary circumstances or changed country conditions necessary for there to be an exception to the one-year filing deadline. With respect to withholding of removal and CAT relief, the IJ found that Lie's testimony was not credible in material respects. Specifically, the IJ noted inconsistencies as to whether Lie's father's store was burned down in 1966, her failure

---

1. The hearing was originally scheduled for March 1, 2004. Lie testified on that date, but the IJ adjourned the hearing when Lie complained that she was ill. The hearing resumed on March 25, 2004, but was adjourned when Lie, again, complained of illness. On January 6, 2005, the hearing resumed. When Petitioners' attorney revealed that Lo was experiencing back pain for which he had taken medication, however, the IJ adjourned the hearing for a third time. On March 4, 2005, the hearing resumed, the IJ having ordered that testimony would begin anew.

to mention the conversion of Rejeki in the first affidavit, and her lack of a persuasive explanation for this and other significant omissions in that affidavit. The IJ found Petitioners credible in testifying that Lo's store was attacked during the May 1998 riots, but found that neither this event nor individual acts of robbery rose to the level of persecution. She also found that, although Indonesia had internal conflict, its government had taken steps to ensure that churches operated openly and freely and that persons of Chinese ethnicity did not suffer discrimination. Accordingly, the IJ denied withholding of removal and CAT relief.

Petitioners appealed to the BIA. In an opinion dated June 23, 2006, the BIA reversed the IJ's denial of asylum on the statutory ground, finding that Petitioners had established extraordinary circumstances for failing to meet the one-year filing deadline. The BIA affirmed, however, the IJ's denial of relief. "[A]ssuming the facts as presented" by Petitioners without addressing the IJ's adverse credibility finding (A.R. at 3), the BIA concluded that the incidents described were not so severe as to rise to the level of persecution. It further found that Petitioners had not established a well-founded fear of future persecution because U.S. State Department reports from 2002 and 2003 indicated that attacks on Christians, while still known to occur in parts of Indonesia such as Bali and the Malukus, were rare or nonexistent elsewhere. The BIA also found that there was no ongoing violence against ethnic Chinese in Indonesia, and that Third Circuit caselaw had not recognized a pattern or practice of persecution of Chinese Christians in Indonesia. This petition followed.

## II.

We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252. Because the BIA did not expressly adopt the IJ's adverse credibility findings, those findings are not before us for review. *Jarbough v. Attorney Gen.*, 483 F.3d 184, 191 (3d Cir.2007); *Kayembe v. Ashcroft*, 334 F.3d 231, 234–35 (3d Cir. 2003). We assume, therefore, Petitioners' credibility.[2] *Jarbough*, 483 F.3d at 191; *Kayembe*, 334 F.3d at 235. Where, as here, the BIA made independent findings without adopting or expressly deferring to the IJ's opinion, we review only the BIA's decision. *Abdulai v. Ashcroft*, 239 F.3d 542, 549 & n. 2 (3d Cir.2001).

The Attorney General may grant asylum to an applicant who demonstrates past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1); *Lie v. Ashcroft*, 396 F.3d 530, 534–35 (3d Cir. 2005). To establish a well-founded fear of future persecution, the applicant must demonstrate both a subjective fear of persecution and an objectively reasonable possibility of persecution. *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir.2003). The objective prong is satisfied either by showing that the applicant would be individually singled out for persecution, or that " 'there is a pattern or practice in his or her country of nationality ... of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social

---

2. Because we deny the petition for review accepting either Lie's or Lo's version of the facts, we leave for another day the quandary of deciding which of two credible, yet conflicting, versions of the facts to credit, or whether, under such circumstances, an assumption of credibility is even warranted.

group, or political opinion.'" *Sukwanputra v. Gonzales,* 434 F.3d 627, 637 (3d Cir.2006) (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)). We review the BIA's conclusions relating to past persecution and an objectively well-founded fear of future persecution for substantial evidence. *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002).

"[P]ersecution connotes extreme behavior, including 'threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.'" *Ahmed v. Ashcroft,* 341 F.3d 214, 217 (3d Cir.2003) (quoting *Fatin v. I.N.S.,* 12 F.3d 1233, 1240 (3d Cir.1993)). Here, substantial evidence supports the BIA's conclusion that the incidents described by Petitioners did not rise to the level of past persecution. More than thirty years separated the 1966 and 1998 riots, and there is nothing to suggest that these acts of civil unrest were government sanctioned or related in any way. As for Lie's testimony that Muslims harassed and threatened her on her way to church with her daughter, and attacked her son on his way to Bible study, these incidents, "perpetrated by unknown assailants" and resulting in, at most, "minor injury," were "not sufficiently severe to be considered persecution." *Lie,* 396 F.3d at 536. Similarly, there is substantial evidence to conclude that the beating of Lie's nephew and theft of his car by unidentified assailants with unknown motives, as well as the mugging of Lo, were nothing more than random criminal acts. *See Gormley v. Ashcroft,* 364 F.3d 1172, 1177 (9th Cir.2004). Finally, second-hand accounts of "criticism" of Rejeki and vague "threats" against Lie for Rejeki's conversion do not rise to the level of past persecution where there is no evidence that Lie has ever been directly threatened for her evangelizing. There is, in sum, substantial evidence to

support the BIA's conclusion that Petitioners failed to established past persecution.

■ Substantial evidence likewise supports the BIA's conclusion that Petitioners failed to establish a well-founded fear of future persecution were they to return to Indonesia. According to the U.S. State Department's 2003 *International Religious Freedom Report,* ongoing violence against Christians in Indonesia is localized in certain provinces, such as Maluku and Central Sulawesi. In other areas, such as Petitioners' home province of East Java, violence against Christians is nonexistent or has fallen sharply due to aggressive government security measures, supporting the BIA's conclusion that Petitioners could avoid future persecution by living in peaceful areas. *See* 8 C.F.R. § 1208.16(b)(2). The U.S. State Department's 2002 *Country Reports on Human Rights Practices for Indonesia* also reports no ongoing violence against ethnic Chinese Christians in Indonesia. Indeed, Petitioners' three grown children, all Chinese Christians who are active in their church, continue to live in Surabaya, East Java, and there is no evidence that they have suffered any violence since Petitioners left Indonesia. *See Lie,* 396 F.3d at 537. We see no reason, therefore, to depart from our conclusion in *Lie* that there is no "pattern or practice" of persecution of Chinese Christians in Indonesia. *Id.* at 537–38. Nothing in our decision in *Sukwanputra,* we note, persuades us otherwise.

Having found substantial evidence to support the BIA's conclusion that Petitioners failed to establish a well-founded fear of future persecution, we conclude that they also failed to satisfy the higher standard for withholding of removal. *Kibinda v. Attorney Gen.,* 477 F.3d 113, 123 (3d Cir.2007). Because Petitioners have abandoned their CAT claim, and there is, in any event, no evidence that they would

more likely than not suffer torture if returned to Indonesia, *see Ghebrehiwot v. Attorney Gen.,* 467 F.3d 344, 352 (3d Cir. 2006), we conclude that substantial evidence also supports the BIA's denial of relief under the CAT.

## III.

For the foregoing reasons, we will deny the Petitioners' joint petition for review.