

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-2008

# Bamba v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2111

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Bamba v. Atty Gen USA" (2008). *2008 Decisions.* Paper 1192.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1192

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT  PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 07-2111

————————

MOKTAR BAMBA,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

————————————

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A97-486-217)
Immigration Judge:  Honorable R. K. Malloy

————————————

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 14, 2008

Before:  RENDELL, GREENBERG and VAN ANTWERPEN, Circuit Judges.

(Filed: May 20, 2008)

————————

OPINION OF THE COURT

————————

PER CURIAM

        Moktar Bamba petitions for review of a decision by the Board of Immigration

Appeals ("BIA") affirming the Immigration Judge ("IJ")'s determination that he failed to

satisfy the "changed circumstances" exception permitting consideration of his otherwise

untimely application for asylum. We will deny his petition.

I.

Bamba is a citizen and native of the Ivory Coast (Cote D'Ivore), a Muslim, as well as a member of the Dioula tribe. Since his father died in 1993, he has been raised by his uncle, Morifere Bamba, a prominent Ivorian political figure and former minister of health. Bamba and other members of his extended family were politically active in their native country, and they have accordingly suffered from various forms of mistreatment at the hands of government forces loyal to successive Ivorian presidents.

In 1989, Bamba's father lost his job as a bank director after the then-president of the Ivory Coast publicly accused him of using bank funds to finance the uncle's political party, which resulted in the bank's closure. In 1991, Bamba organized and participated in a student anti-government demonstration. During the demonstration, he was beaten by Ivorian soldiers and then had to flee the scene with the assistance of some friends. He was then sent to school in Paris, France, eventually returning to the Ivory Coast in 1994 to live with his uncle. Bamba attended school in London, England, from 1997 to July 2000. In July 2000, he briefly went back to his uncle's house but then left for Paris the following month for "security reasons." (A10.) His uncle did not send Bamba back to London because an Ivorian student opposition leader had been stabbed in the city. It appears that, while he lived with his uncle in the Ivory Coast, his uncle was repeatedly arrested, their home was frequently searched by government forces, and Ivorian soldiers fired their weapons in front of the house in order to threaten them.

2

Bamba entered the United States in May 2001 as a non-immigrant visitor.[1] After consulting with an immigration attorney, Bamba decided not to request asylum because he wished to return to his home country and hoped for eventual improvements through a reconciliation process convened by the country's president. However, an attempted coup, which was evidently supported by his uncle and other members of his extended family, occurred in September 2002. The failed coup spawned a rebel insurgency, and government forces, including death squads, attacked and killed coup supporters as well as ethnic and religious groups believed to be supporting of the rebels, including Muslims and members of the Dioula tribe. The name of Bamba's mother was found on a death squad hit list, and she was forced to leave the country in October 2002. His uncle had previously left the country immediately before the coup attempt, and his other relatives also eventually fled the country in the wake of the failed coup.[2]

Bamba failed to depart when his visa expired. On July 28, 2003, he filed an application for asylum, withholding of removal, and protection under the Convention Against Torture. Recognizing that his asylum application was not filed within one year of his date of arrival in the United States as required by 8 U.S.C. § 1158(a)(2)(B), Bamba

---

[1] It appears that Bamba first entered the United States in October 2000 but then went back to Paris in April 2001.

[2] His uncle had previously left the Ivory Coast in November 2000, following the country's elections. In 2001, the uncle returned to participate in an official national reconciliation effort, but, after his relations with the Ivorian president soured, he went back to France. He again returned to the Ivory Coast in 2002, only to leave immediately before the coup attempt.

claimed that his untimeliness should be excused because the coup attempt and its consequences constituted "changed circumstances which materially affect [his] eligibility for asylum." 8 U.S.C. § 1158(a)(2)(D). After extensively summarizing Bamba's testimony, the IJ concluded that he failed to demonstrate that such events "rise to the level of extraordinary circumstances or changed country conditions." (A30-A31.) However, she further determined that he was entitled to withholding of removal based on his membership in a particular social group (i.e., his extended family), religion, and ethnicity. The BIA subsequently dismissed Bamba's appeal, expressly adopting and affirming the IJ's decision regarding the asylum application. Bamba filed a timely petition for review.[3]

## II.

As the IJ noted, an alien must generally file his or her asylum application within one year of the date of arrival in the United States. See 8 U.S.C. § 1158(a)(2)(B). It is undisputed that Bamba's application, filed more than two years after he last entered the country, failed to satisfy the one-year requirement. Bamba therefore invoked a statutory exception providing that an otherwise untimely asylum application "may be considered . . . if the alien demonstrates to the satisfaction of the Attorney General either the existence of *changed circumstances which materially affect the applicant's eligibility for asylum* or extraordinary circumstances relating to the delay in filing an application within the [specified] period." 8 U.S.C. § 1158(a)(2)(D) (emphasis added). After summarizing

---

[3] Because the BIA adopted the IJ's ruling, we must review the decision of the IJ. See, e.g., Sukwanputra v. Gonzales, 434 F.3d 627, 631 (3d Cir. 2006).

4

Bamba's claim of changed circumstances, the IJ expressly concluded that he failed to satisfy this exception and that he was thereby statutorily ineligible for asylum.

It is well established that we are statutorily barred from reviewing administrative factual determinations under the changed circumstances exception. The immigration statute states that "[n]o court shall have jurisdiction to review any determination of the Attorney General under [§ 1158(a)(2)]." 8 U.S.C. § 1158(a)(3). Although the REAL ID Act of 2005 authorizes judicial review of constitutional claims and questions of law notwithstanding this jurisdiction-stripping provision, see 8 U.S.C. § 1252(a)(2)(D), we have held that this provision nevertheless "continues to divest the court of appeals of jurisdiction to review a decision regarding whether an alien established changed or extraordinary circumstances that would excuse his untimely filing." Sukwanputra v. Gonzales, 434 F.3d 627, 635 (3d Cir. 2006) (citations omitted). Accordingly, we lack jurisdiction to review the IJ's factual and discretionary determination regarding whether Bamba established the requisite changed circumstances. See, e.g., Jarbough v. Attorney General, 483 F.3d 184, 188-90 (3d Cir. 2007); Sukwanputra, 434 F.3d at 632-35.

Apparently recognizing our jurisdictional limits, Bamba argues in some detail that, instead of committing mere factual errors, the IJ actually applied the wrong legal standard.[4] In particular, he contends that, in order to ascertain whether the changed

---

[4] To the extent Bamba actually challenges the IJ's factual and discretionary findings in rejecting his changed circumstances claim, we would be required to dismiss his petition for review for lack of jurisdiction. See, e.g., Jarbough, 483 F.3d at 188-90; Sukwanputra, 434 F.3d at 632-35.

circumstances were in fact "material" for purposes of the exception, the IJ was required to assess whether he was actually eligible for asylum *before* the changes. In other words, the IJ should have specifically assessed his asylum eligibility *before* the 2002 coup attempt and its tragic consequences, which Bamba asserts she failed to do. It is true that this Court has jurisdiction under the REAL ID Act to review questions of law. See, e.g., Jarbough, 483 F.3d at 188-90; Sukwanputra, 434 F.3d at 633-35. However, the 2005 act created a "narrow" exception to the otherwise applicable jurisdiction-stripping provision. Jarbough, 483 F.3d at 188, 190. In any case, we conclude that Bamba's theory fails to raise "a colorable claim of legal error" in the current circumstances. Sukwanputra, 434 F.3d at 635.

We need not decide whether Bamba is correct that an IJ (or the BIA) must, as a general rule, specifically ascertain whether an alien was entitled to asylum before the alleged changes in circumstances. In this case, it appears that the IJ did implicitly consider whether Bamba was entitled to asylum prior to the failed coup attempt and then essentially determined that he was in fact entitled to such relief because of past persecution or a reasonable fear of persecution in the future. See, e.g., 8 U.S.C. § 1101(a)(42)(A). In denying the changed circumstances claim, she expressly stated that his family has been actively opposed to "the governments of the Ivory Coast since . . . the first president of the Ivory Coast" and specifically noted that his now-deceased father lost his bank position because of his political activities. (A30.) As quoted by the IJ, Bamba's own affidavit submitted in support of his changed circumstances claim acknowledged that

6

he was informed by an immigration attorney after his arrival in the United States, "that if I lost [my asylum request], I would be automatically deported to the Ivory Coast and most likely be killed by [the Ivorian president's] men because of my uncle." (A29.) The IJ also extensively summarized Bamba's own testimony regarding past political involvement and mistreatment, and this past history then played a role in her withholding of removal determination. For instance, he testified that as early as 1991 he organized and participated in an anti-government demonstration and that the military attacked and beat him as a result. He was sent to London for school immediately following that incident, and he then spent a substantial portion of the next decade outside of the Ivory Coast, either in France or England. At one point in time, his uncle sent him to Paris and not London because an Ivorian opposition leader had been the victim of a stabbing in the British capital. On the other hand, when he did live with his uncle in the Ivory Coast, their home was often searched by government agents, his uncle was repeatedly arrested, and soldiers threatened them by shooting off their weapons. Finally, although Bamba emphasizes that political conditions were improving before the coup attempt as a result of reconciliation efforts, his uncle actually fled the country during this reconciliation process.

Accordingly, especially in light of her entire 39-page oral ruling, the IJ properly considered Bamba's claim of changed circumstances. We reiterate the limited scope of our inquiry. We are precluded from addressing whether the IJ's discretionary findings of fact made in rejecting Bamba's claim of changed circumstances were correct or otherwise

7

supported by the evidence in the record.  See, e.g., Jarbough, 483 F.3d at 189

("Specifically, courts have recognized [that] arguments such as that an Immigration Judge

or the BIA incorrectly weighed evidence, failed to consider evidence or improperly

weighed equitable factors are not questions of law under § 1252(a)(2)(D)." (citations

omitted)); Sukwanputra, 434 F.3d at 635.  As Bamba expressly acknowledges, we lack

jurisdiction to review the IJ's factual findings, even if they were erroneous.  Because we

conclude that Bamba's claim that the IJ applied an incorrect standard of law is without

merit, we must reject his petition.

III.

For the foregoing reasons, we will deny the petition for review.