

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-2003

# Tarrawally v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 02-2951

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Tarrawally v. Atty Gen USA" (2003). *2003 Decisions.* Paper 314.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/314

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 29, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2951

SULAIMAN TARRAWALLY,

Petitioner

v.

JOHN ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES,

Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(INS No. A 94-006-655)

Submitted Under Third Circuit LAR 34.1(a)
July 10, 2003

Before: NYGAARD, SMITH, *Circuit Judges*
and IRENAS,* *District Judge.*

(Opinion Filed: July 29, 2003)

**Counsel for Petitioner**
Steven A. Morley, Esq.
Bagia & Morley
The Bourse, Ste. 592
111 S. Independence Mall East
Philadelphia, PA 19106

* Honorable Joseph E. Irenas, Senior United States District Judge for the
District of New Jersey, sitting by designation.

**Counsel for Respondent**
Robert D. McCallum, Jr., Esq.
Assistant Attorney General
Civil Division

Terri J. Scadron, Esq.
Assistant Director

Efthimia S. Pilitsis, Esq.
Michael P. Lindemann, Esq.
John D. Williams, Esq.
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, DC 20044-0878

---

## OPINION OF THE COURT

---

SMITH, *Circuit Judge*:

## I.  INTRODUCTION

Petitioner Sulaiman Tarawally[1] appeals the denial of his application for asylum and for withholding of removal under the Immigration and Nationality Act, and his request for relief under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture" or "Convention"). We now add our voice to the chorus of other circuits which have held that a court of appeals lacks jurisdiction to review an asylum petition that an Immigration Judge ("IJ") or Board of Immigration Appeals ("BIA") deems untimely. In reaching the merits of the petitioner's requests for withholding of removal and relief under the Convention Against Torture, we conclude that the Immigration Judge's finding that Tarawally was not

---

1. Petitioner's name is frequently misspelled "Tarrawally" in the record, as it is in the above caption.

likely to be persecuted or tortured was supported by substantial evidence.

## II.  FACTS

Sulaiman Tarawally is a citizen of Sierra Leone who entered the United States in January 1998 as a visitor for pleasure with authorization to remain until February 10, 1998. Tarawally filed an application for Temporary Protected Status, which was eventually denied. Sometime after October 12, 1999, he filed an application for asylum, withholding of removal and relief under the Convention Against Torture.

During the asylum hearing that followed, Tarawally testified to his personal history in Sierra Leone. Tarawally's father was chairman of the All People's Congress ("APC") for the Kono district of Sierra Leone. The APC was the ruling party until a 1992 coup, during which the National Provisional Ruling Council, also known as the Armed Forces Revolutionary Council ("AFRC"), took power. In early 1992, the AFRC arrested Tarawally's father for his political activities and detained him for about a month. At that time, Tarawally was living in the town of Bamakonta, some nine to twelve miles away from his family. Sometime after his father's detention, in March of 1992, Tarawally was visiting his family's home and awoke one night to the sound of gunfire. When he discovered that the rest of his family was missing, he immediately left Kono. He spent three days walking to the town of Bo, Sierra Leone, where he lived and attended secondary school from 1992 to 1993.[2]

In 1993, the school was closed due to civil unrest, so Tarawally traveled first to Guinea for three months, then to Gambia for a year, returning to Sierra Leone in 1994. Although Tarawally's application for admission to Injala University in Bo was accepted, he did not attend because of financial constraints.

---

2. Tarawally's testimony on this point is unclear. He seems to suggest that between 1986 and 1993 his primary residence was in Bamakonta, but that he spent most of his time in Bo where he attended high school.

Tarawally regularly traveled back and forth between Sierra Leone and Gambia from 1994 until 1996. Sometime in 1996 or 1997, Tarawally was sleeping in a school in Gambia when other Sierra Leone citizens, also in Gambia, threw a Molotov cocktail into the building. When Tarawally attended a soccer game in Gambia, he was physically attacked by the same individuals who had thrown the Molotov cocktail.[3]

Between 1993 and 1997, Tarawally advocated in support of the APC and assisted new members to register to vote. He also was active in the Student Mobilization For Democracy ("SMFD"), and the Youth Defense Army vigilante group in Sierra Leone. All of these groups opposed the Revolutionary United Front ("RUF") and AFRC.

In 1996, Tarawally discovered that his family was living in the town of Makeni in Sierra Leone and visited them for a week. He then went to Freetown, Sierra Leone, where he lived for a year. Around this time, he became uneasy about his participation in the SMFD and therefore decreased his involvement in its activities.

Although the Sierra Leone People's Party had been elected to power in 1996, a coup d'etat occurred in May of 1997, and the RUF, with support from the AFRC, overthrew the government.[4] After the coup, the AFRC and the SMFD met in Freetown, and the AFRC threatened Tarawally and other SMFD members with amputation of their limbs if they did not cooperate and support the AFRC regime. Three days later, Tarawally was arrested[5] in Freetown and then taken to the Pademba detention facility where he was held for several weeks and beaten. Around the same time, on June

---

3. In his 1998 affidavit accompanying his asylum application, which was prepared with the assistance of his counsel, Tarawally claimed that the threats occurred in Gambia in 1994, and that he did not return to Sierra Leone until 1996.

4. The RUF and AFRC subsequently merged into one party, but the party was overthrown in March of 1998 after Tarawally left Sierra Leone.

5. In his affidavit, Tarawally stated that these threats about amputation were made when he was arrested, rather than at the meeting. During his cross-examination, he sought to explain the discrepancy by saying that the same threats were made on both occasions.

18, 1997, Tarawally's father and sister were killed for their political activities and their opposition to the RUF.[6] Tarawally was able to escape from prison with the assistance of a former school friend who was working there. Tarawally fled through the jungle to Guinea, a journey of approximately 75 miles, which he said he made in two days. He then went from Guinea to Gambia. He subsequently fled to the United States.

## III.  PROCEDURAL POSTURE

Following a removal hearing, the IJ issued an opinion in which he determined that because Tarawally did not file his asylum application within one year of his entry into the United States, his request for asylum should not be considered. The IJ then denied Tarawally's application for withholding of removal and relief under the Convention Against Torture, finding that Tarawally was not credible because of: 1) his initial uncertainty as to how long his father was detained following arrest; 2) his lack of knowledge regarding how his father was treated in prison; 3) his initial uncertainty as to what night he heard gunfire and fled Kono; 4) the implausibility that he would walk 97 kilometers from Kono to Bo and "instead of trying to locate his missing family, decide[] to enroll in a school in that city;" 5) the inconsistency between his 1998 affidavit, in which he stated that he started a new chapter of the SMFD in Bo in 1997 and that he was chairman of the chapter at the school, and his later testimony that he stopped actively participating in the SMFD organization in 1996, and that he never attended the University; 6) the conflicting dates he provided of his arrest, both early 1997 and June of 1997; 7) contradictions between petitioner's affidavit and his testimony as to the dates he attended high school; 8) contradictions as to whether he attended the University and whether he applied in 1993 or in 1997 after his father's death; 9) contradictions between his affidavit and his testimony as to whether threats of amputation occurred at

---

6. In his affidavit, Tarawally stated that after his father and sister were killed he returned to Bo to attend the University, and it was at that time that the meeting between the SMFD and ARFC took place.

the meeting between the AFRC and SMFD or three days later; 10) his failure to testify, consistent with his affidavit, that he was cut with razor blades and beaten senseless when arrested; 11) the inconsistency between his statement that he left prison in June 1997 and his affidavit that he arrived in Guinea in September, and that the trip took him only two days; 12) the implausibility that, between 1993 and 1997, he would have traveled back and forth between Sierra Leone and Gambia (a three to four day trip each way) with regularity to participate in student groups; and 13) contradictions as to whether he ever returned to Bo after 1993.

The BIA affirmed without opinion pursuant to 8 C.F.R. § 3.1(a)(7).[7]

## IV.  JURISDICTION

The IJ had subject matter jurisdiction under Sections 208(a) and 241(b)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b). The BIA exercised jurisdiction pursuant to 8 C.F.R. §§ 3.1 and 240.15. We have jurisdiction under Section 242(a) of the INA, 8 U.S.C. § 1252(a).

## V.  STANDARD OF REVIEW

Although we normally review only the decisions of the BIA, where the BIA summarily affirms the IJ's decision, we "must then review the decision of the IJ." *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002).[8]

We review de novo the issue of whether we have jurisdiction to determine what constitutes extraordinary circumstances for a late filed asylum petition. *See Valansi v. Ashcroft*, 278 F.3d 203, 207 (3d Cir. 2002).

---

7. The BIA issued its ruling on June 13, 2002. In 2003, the regulations were renumbered and the streamlining regulation by which a single Board member is permitted to affirm without opinion is now set forth at 8 C.F.R. § 1003.1(a)(7).

8. Petitioner did not challenge our authority to review the IJ's decision when the BIA issues a summary affirmance under the streamlining regulation, or the validity of the regulation.

The IJ's adverse credibility determination and findings of fact with respect to his withholding and Convention claims must be reviewed under the substantial evidence standard. We will not disturb the IJ's credibility determination and findings of fact if they are "supported by reasonable, substantial and probative evidence on the record considered as a whole." *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998) (internal quotation marks and citation omitted). Although we generally defer to the IJ's inferences, "deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole." *Id.* at 162 (internal quotation marks and citation omitted).

## VI.  LEGAL ANALYSIS

### A.  Eligibility for Asylum

An alien must prove by clear and convincing evidence that he filed his asylum application within one year of arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). However, if the alien can establish that there are "extraordinary circumstances relating to the delay in filing the application," failure to file the application within the one year period may be excused. 8 U.S.C. § 1158(a)(2)(D).

The relevant regulation lists as one possible extraordinary circumstance that "the applicant maintained Temporary Protected Status . . . until a reasonable period before the filing of the asylum application." 8 C.F.R. § 208.4(a)(5)(iv). Tarawally argues that although he submitted his application for asylum more than a year after his arrival and although he was never granted Temporary Protected Status, the application for such status was itself an extraordinary circumstance.

The Government argues that we lack jurisdiction to review this question. In most cases, this court has jurisdiction to review a final order of removal resulting from the denial of an asylum request. *See* 8 U.S.C. § 1252(a)(1). However, INA Section 208(a)(3), 8 U.S.C. § 1158(a)(3), provides that "no court shall have jurisdiction to review any determination by the Attorney General under paragraph

[(a)](2)," which includes the provision relating to whether extraordinary circumstances warrant waiving the one year time limitation for asylum applications. While there must be "clear and convincing evidence" to support a finding that Congress intended to preclude judicial review of an administrative action, specific language in a statute that indicates an intent to preclude judicial review satisfies this requirement. *See Board of Governors of the Fed. Reserve Sys. v. McCorp Fin. Inc.*, 502 U.S. 32, 44 (1991); *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984); *see also INS v. St. Cyr*, 533 U.S. 289, 298 (2001).

In *Ismailov v. Reno*, 263 F.3d 851, 855 (8th Cir. 2001), the Eighth Circuit addressed whether it had jurisdiction to review the BIA's determination that the petitioner failed to demonstrate extraordinary circumstances with respect to his failure to file his asylum petition within one year of his arrival in the United States. That court held that it had no jurisdiction to review the BIA's decision, "because § 1158(a)(3) clearly indicates congressional intent to preclude judicial review of decisions made pursuant to § 1158(a)(2)." *Id.*

The Ninth Circuit followed the Eighth Circuit's lead in *Hakeem v. INS*, 273 F.3d 812, 815 (9th Cir. 2001). In *Hakeem*, the IJ denied the petitioner's request for asylum based on the untimeliness of his application, and the BIA dismissed the appeal, adopting the IJ's reasoning. The Ninth Circuit held that based on the language in § 1158(a)(3) it lacked jurisdiction to review the denial of asylum, as it was premised on the IJ's finding that the petitioner failed to file his asylum application within one year after his entry into the United States.

The Tenth and Eleventh Circuits subsequently addressed the same issue and held that they lacked jurisdiction to review denials of asylum petitions that an IJ or the BIA deemed untimely, based on the plain meaning of § 1158(a)(3). *Tsevegmid v. Ashcroft*, 318 F.3d 1226, 1230 (10th Cir. 2003); *Fahim v. INS*, 278 F.3d 1216, 1217 (11th Cir. 2002). The Eleventh Circuit noted that "[t]he language of section 1158(a)(3) is so clear that several courts have, in dicta, used the section as an example of a clear

congressional limit on courts' jurisdiction." *Fahim,* 278 F.3d at 1218.

We agree that the language of 8 U.S.C. § 1158(a)(3) clearly deprives us of jurisdiction to review an IJ's determination that an asylum petition was not filed within the one year limitations period, and that such period was not tolled by extraordinary circumstances. We therefore join the Eighth, Ninth, Tenth and Eleventh Circuits in holding that we are precluded from reviewing such determinations made pursuant to 8 U.S.C. § 1158(a)(2). *See Tsevegmid,* 318 F.3d at 1230; *Fahim,* 278 F.3d at 1217; *Hakeem,* 273 F.3d at 815; *Ismailov,* 263 F.3d at 855. While we lack jurisdiction to review the IJ's denial of Tarawally's asylum petition, based on the IJ's finding of untimeliness, Tarawally's applications for withholding of removal and relief under the Convention Against Torture are ripe for disposition.

### B. Withholding of Removal

The standard for withholding of removal under INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A), is: "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion." The alien must establish by a "clear probability" that his life or freedom would be threatened in the proposed country of deportation. *INS v. Stevic,* 467 U.S. 407 (1987); *Janusiak v. INS,* 947 F.2d 46, 47 (3d Cir. 1991). A clear probability means "more likely than not." *Stevic,* 467 U.S. at 429-30.

Since Tarawally did not introduce any evidence other than his testimony to show that he belonged to groups opposing the AFRC/RUF and was persecuted on account of his political opinion, the IJ's adverse credibility determination precludes Tarawally from prevailing on his INA withholding of removal claim. We therefore must determine whether the IJ's adverse credibility determination was supported by substantial evidence.

Tarawally argues that the reasons offered by the IJ for his adverse credibility determination were either based on

inferences or presumptions not grounded in the record as a whole, or on minor inconsistencies in dates that were easily explainable. First, Tarawally explains that his confusion as to dates was reasonably based, in part, on the fact that the events in question occurred almost nine years earlier. Second, he suggests that even though he requested that the hearing be held in English, the language barrier played a role in his misunderstanding the IJ's questions.[9]

Tarawally points to two examples of confusion which he claims arose from the language barrier. First, Tarawally suggests that the IJ did not understand what he meant when he said the rebel forces sought his father's "consent." The record demonstrates, however, that the IJ was able to determine that the "consent" the rebels were seeking was that Tarawally's father agree to withdraw from his political activities. Second, when the IJ asked if Tarawally "missed" his father, Tarawally claims he was unsure whether the IJ was asking if he was longing for his father or whether the two failed to connect at a particular time. This alleged uncertainty does not demonstrate that Tarawally had difficulty comprehending English; a person fluent in the language could just as easily be confused by the use of the word "miss." In any case, these examples are completely unrelated to the contradictions cited by the IJ. They do not demonstrate that Tarawally was having problems understanding the IJ because of a language barrier, and in light of the fact that Tarawally turned down the IJ's offer to provide a translator, he cannot now blame inconsistencies in his testimony on his lack of fluency.

Some of the IJ's reasons for his adverse credibility determination were based on presumptions not grounded in

---

9. In his brief in support of appeal to the BIA, Tarawally also pointed out that he injured his head in a serious automobile accident on May 20, 2000, and was taking numerous prescription medications for forgetfulness and loss of memory. A letter dated June 15, 2000, from the Reading Hospital and Medical Center confirms that Tarawally was hospitalized for a month as a result of the accident, and that he "continue[d] to have significant cognitive deficits and [was] continuing therapy on an outpatient basis." However, Tarawally did not introduce any evidence that he continued to experience cognitive deficits a year later when the hearing took place.

the record, such as his conclusion that it was implausible that Tarawally would not know exactly how his father was treated in prison, and that after walking 97 kilometers from Kono to Bo, "instead of trying to locate his missing family, [he] decided to enroll in a school in that city." However, the IJ also offered other rationales which went to the heart of the withholding of removal and Convention claims, and which could not be adequately explained by forgetfulness on the part of petitioner. For example, the IJ noted that Tarawally stated in his affidavit that he started a school chapter of the SMFD in Bo in 1997 and that he was chairman of the chapter, but testified that he was rarely participating in SMFD meetings or activities in 1997, and was living in Freetown not Bo; he contradicted himself as to whether he ever attended the University and whether he applied in 1993 immediately after high school or in 1997 after his father's death; he stated that he left prison in June 1997 and arrived in Guinea in September, but that the trip took him only two days; and he could not decide if he had ever returned to Bo for SMFD activities after his high school closed in 1993.

Moreover, although some minor discrepancies between Tarawally's 1998 affidavit and 2001 testimony might be understandable, Tarawally made irreconcilable contradictory assertions within the span of a few minutes.

> Judge: I'm getting different answers here. He's answering both ways. Let me, let me understand. From the time you left Bo in '93, did you go back there, yes or no?
>
> A: Yes
>
> Judge: You went back to Bo?
>
> A. [Indiscernible]
>
> Judge: Let me go on to the next tape. You can think about your answer while I change the tape.
>
> Q. All right. Now, you thought about the question, sir. Since you, since you left Bo in '93 did you ever return there? . . . Since you left Bo in '93 did you ever return to Bo?

A. No.

. . .

Q. When was the last time you lived at that address [in Bo]?

A. '93.

Q. '93

A. Yeah

Q. All Right.

Judge: Proceed, Counsel.

Tarawally to Judge: To '97, something like that.

Judge: '93 to '97?

A. '93, something like that . . . .

These inconsistencies and contradictions are not minor in nature but are material to the claim. As such, they constitute substantial evidence supporting the IJ's adverse credibility determination. Therefore, the IJ did not err in denying Tarawally's application for withholding of removal.

*C. Convention Against Torture*

The IJ denied the application for withholding under the Convention, in part because he found that Tarawally lacked credibility. He also stated that even if Tarawally were credible, he did not prove that he would be tortured if returned to Sierra Leone.

Under the Convention's implementing regulations "the burden of proof is on the applicant to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The torture must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). However, the torture need not be on the basis of Tarawally's political opinion, as is the case with asylum and withholding of removal. The evidence that the decision-maker should consider in evaluating whether the petitioner would be tortured includes "[e]vidence of gross,

flagrant or mass violations of human rights within the country of removal" and "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3). Several courts have held that "country conditions alone can play a decisive role in granting relief under the Convention." *Kamalthas v. INS*, 251 F.3d 1279, 1280 (9th Cir. 2001); *see also Mansour v. INS,* 230 F.3d 902, 908 (7th Cir. 2000). Accordingly, a decision-maker must review claims for relief under the Convention and consider relevant country conditions even where adverse credibility determinations have precluded relief under the INA. *See Mansour*, 230 F.3d at 908; *Kamalthas*, 251 F.3d at 1284.

Petitioner suggests that even if his testimony is not credible, he established his eligibility for relief under the Convention based on the documents he submitted discussing country conditions. He claims that these documents demonstrate that torture by the AFRC/RUF, the current government, and the ECOMOG, a coalition of West African peace-keeping forces stationed in Sierra Leone, is so widespread that he is likely to be tortured if returned to Sierra Leone.

While the documents do establish that citizens who do not support the AFRC/RUF are specifically targeted for torture, such as limb amputation, petitioner has introduced no evidence other than his own testimony that he was a member of groups opposing AFRC/RUF, such as the APC and SMFD. Therefore, accepting the IJ's adverse credibility determination, we must assume that the AFRC/RUF would treat Tarawally no differently than an ordinary citizen. Although Amnesty International recognizes that AFRC/RUF members commit "gross human rights abuses on a large scale," [R. 333] and that many civilians are killed arbitrarily even if they do not oppose the AFRC/RUF [R. 344], these statements alone are insufficient to demonstrate that it is more likely than not that a particular civilian, in this case Tarawally, will be tortured by AFRC/RUF if returned to Sierra Leone.[10]

---

10. Moreover, even if Tarawally could establish that he was likely to be tortured by the AFRC/RUF, his claim would still fail. The AFRC/RUF is

Similarly, Tarawally failed to establish the likelihood that he will be tortured by the current government and/or the ECOMOG. While both have been accused of "gross violations of human rights." [R. 323], this does not demonstrate that it is more likely than not that Tarawally will be tortured.

Nor can Tarawally prevail on his argument that the current government will detain and torture him because it will believe him to be a supporter of the rebels based on the fact that he fled the country. Tarawally introduces no evidence to support either the fact that the government detains individuals re-entering Sierra Leone, or the fact that it presumes such individuals to be its opponents.[11] Thus, the IJ did not err in refusing to grant relief under the Convention Against Torture.

---

no longer in power; therefore Tarawally cannot establish that any torture by the AFRC/RUF is at the instigation or with the acquiescence of the current government. *See Lukwago v. Ashcroft*, 329 F.3d 157, 183 (3d Cir. 2003) (upholding denial of relief under Convention because petitioner alleged he would be tortured by the LRA rebels and since this was a guerilla group that fought the government, the government did not acquiesce in the LRA activities); *Amanfi v. Ashcroft*, 328 F.3d 719, 726 (3d Cir. 2003) (upholding denial of relief under Convention because petitioner did not show that any public official had "awareness of this torture" by private individuals but refused to intervene and provide protection).

It might be possible to argue that the AFRC/RUF should be viewed as a government entity since they were formerly in power, the Sierra Leone government is not particularly stable, and the AFRC/RUF might regain control at any moment. Nonetheless, in light of Tarawally's failure to introduce substantial evidence to show the likelihood he will be tortured by the AFRC/RUF, we need not reach this issue.

11. *Cf. Zubeda v. Ashcroft,* No. 02-2868, ___ F.3d ___, 2003 WL 21436806 at *14-15 (3d Cir. June 23, 2003) (where documentary evidence showed that government routinely tortured those it detained, if IJ took administrative notice of the likelihood that petitioner would be detained upon his return, petitioner might be entitled to withholding under the Convention despite adverse credibility determination).

## VII.   CONCLUSION

For the foregoing reasons, we will affirm the decision of the IJ.

A True Copy:
          Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*