

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-12-2007

# Soegianto v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5348

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Soegianto v. Atty Gen USA" (2007). *2007 Decisions.* Paper 782.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/782

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

No. 05-5348

———

MULJADI SOEGIANTO,
                              Petitioner
                    v.

ATTORNEY GENERAL OF THE UNITED STATES,
                              Respondent

———

Petition for Review of the Order
of the Board of Immigration Appeals
(A96-265-766)
Immigration Judge: Hon. Miriam K. Mills

———

Submitted Under Third Circuit LAR 34.1(a)
July 9, 2007

Before: SLOVITER, HARDIMAN, and ROTH, Circuit Judges

(Filed July 12, 2007 )

———

OPINION

———

SLOVITER, <u>Circuit Judge</u>.

Muljadi Soegianto petitions for review of an order of the Board of Immigration Appeals ("BIA") adopting and affirming the decision of the Immigration Judge ("IJ") denying his application for asylum and withholding of removal.[1] As an ethnic Chinese Christian living in Indonesia, Soegianto seeks relief on the basis of his race and religion. More specifically, Soegianto alleges that he was economically persecuted in that he was forced to pay bribes to accomplish simple tasks, that his business suffered as a result of violent attacks, and that a pattern and/or practice of persecution against ethnic Chinese Christians persists in Indonesia.

The IJ held that Soegianto was statutorily ineligible to apply for asylum, and that his claim for withholding of removal failed both subjectively and objectively to establish a well-founded fear of persecution. Soegianto did not appeal the denial of his asylum claim to this court and the IJ's holding with respect to his claim for withholding of removal is supported by substantial evidence. We agree that Soegianto has not established past persecution or a well-founded fear of future persecution were he to return to Indonesia. Therefore, we will deny the petition for review.

---

[1] Soegianto also included a claim under the Convention Against Torture ("CAT"). However, in his brief he mentions the CAT claim only superficially and fails to rebut the Government's argument that he had waived his CAT claim. As such, we deem the CAT claim waived. Even were we not to do so, we are satisfied that the CAT affords no relief in this case.

2

# I.

Soegianto is a native and citizen of Indonesia of Chinese descent. He is divorced and has a ten-year-old daughter and a seven-year-old son who both live in Indonesia. He came to the United States for the first time in May 1995, as a visitor. He then returned home to Indonesia before once again coming to the United States as a visitor in May 1999. His visitor status expired on August 22, 1999; nevertheless, he has remained in the United States.

Because Soegianto's claim for asylum was untimely, we consider only his claim for withholding of removal. As we have discussed in numerous cases involving ethnic Chinese asylum applicants from Indonesia, in the late 1990s there was a wave of attacks perpetrated by Muslim Indonesians on Chinese Christians. See, e.g., Lie v. Ashcroft, 396 F.3d 530, 532 (3d Cir. 2005). Soegianto makes substantially the same claim, i.e., that he was harassed and persecuted because of his race and religion. What he alleges, however, is a far cry from the type of persecution encompassed by the statute. For example, he states that in 1991 and 1992 he was forced to wait for long periods of time to procure licenses for his uncle's real estate company, that he was required to pay extra money to obtain licenses and that those issuing the licenses would "lie to [him], treat [him] with disrespect and make [him] leave and return to the office at least three times" before he could get a license. A.R. at 143. While trying to start his own business he faced similar problems and was only able to break even after paying the "Chinese tax." A.R. at 161.

3

He next alleges that in connection with riots in Jember in 1997 he was harassed by "a large group of native youths." A.R. at 144. They were allegedly carrying "swords and sickles" and demanded to see an identification card after inquiring if Soegianto was of Chinese descent. A.R. at 162. He then paid them 20,000 rupiahs to let him go. Id.

He also states that at the time of the Jember riots, he was harassed by a group of Indonesian youths in his office, that they made derogatory comments to him, and that they broke his office windows and smashed everything inside. Soegianto went to the police and informed them of the incident, but nothing was done to solve the problem. He said that the riots prevented him from doing business and made it difficult to obtain help. However, he merged businesses with his brother in July 1997, which allowed him to pay more for workers which therefore led to easier recruitment.

Finally, Soegianto states that he was uncomfortable attending church in Jember in 1997 and 1998 because the army was forced to guard the churches to protect them from ethnic and sectarian violence. He also states he was forced to switch to another church because the pastor told the congregation that a certain church was no longer safe.

In sum, Soegianto states that the cumulative effect of the incidents left him "depressed and traumatized," and that he would become "instantly fearful" upon sight of a large group of natives. A.R. at 163. Further, he stated that after the attack on his office he "lost everything and felt as if the meaning of [his] life had slipped away from [him]." A.R. at 163.

4

Soegianto filed an application for asylum and for withholding of removal on April 1, 2003. Removal proceedings were commenced against him, and he was charged with being deportable under Section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), as an alien, who after admission as a non-immigrant visitor under Section 101(a)(15) of the INA, stayed in the country beyond the permitted time period. He later amended his application for asylum and withholding of removal and included a claim under the CAT.

At his hearing before the IJ, Soegianto conceded his removability and also raised voluntary departure as an alternative form of relief. Following a merits hearing, the IJ issued an oral decision on August 5, 2004, denying Soegianto's application but granting his request for voluntary departure, with an alternate order of removal to Indonesia. Soegianto appealed the decision to the BIA, which adopted and affirmed the IJ's decision and dismissed the appeal. Soegianto then filed a timely petition for review.

We have jurisdiction to review final orders of the BIA under section 242(a) of the INA, 8 U.S.C. § 1252(a)(5). The petition is timely as it was filed within thirty days of the BIA's final order. 8 U.S.C. § 1252(b)(1). Where, as here, the BIA adopts and affirms the decision of the IJ we must review the decision of the IJ. Abdulai v. Ashcroft, 239 F.3d 542, 549 n.2 (3d Cir. 2001); Tarrawally v. Ashcroft, 338 F.3d 180, 184 (3d Cir. 2003). We will uphold the decision of the IJ as long as it is supported by substantial evidence. INS v. Elias-Zacarias, 502 U.S. 478, 480 (1992); Lie, 396 F.3d at 534.

5

## II.

Under the INA, in order to qualify for withholding of removal Soegianto must demonstrate that his life or freedom would be threatened on the basis of a protected ground in the country to which he faces removal. 8 U.S.C. § 1231(b)(3)(A). The INA states, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion." Id. As we stated in Tarrawally, "the alien must establish by a 'clear probability' that his life or freedom would be threatened in the proposed country of deportation." 338 F.3d at 186 (quoting INS v. Stevic, 467 U.S. 407 (1984)). Soegianto can meet this burden either by establishing past persecution, which raises a rebuttable presumption of future persecution, or by establishing that it is more likely than not that he will be subjected to future persecution upon removal to Indonesia. 8 C.F.R. §§ 208.16(b)(1) & (b)(2).

Persecution is defined as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993). Discrimination, as distasteful as it is, does not constitute persecution. Persecution is an "extreme concept that does not include every sort of treatment our society regards as offensive." Id. at 1243. Economic persecution must rise to a level beyond ordinary criminal activity. See, e.g., Lie, 396 F.3d at 536.

6

The IJ rejected Soegianto's claim for economic persecution, and there was ample basis for that ruling. The record shows that Soegianto was able to support himself despite the problems he faced. Further, his older brother continues to work in Indonesia and is able to support himself as well. His parents also are retirees in Indonesia and another brother takes whatever employment he can find. The incidents that Soegianto has described do not rise to the level of economic persecution for which a claim of withholding of removal could be granted. There is substantial evidence to support the IJ's finding that he also has failed to demonstrate that it is more likely than not that he would face future persecution upon return to Indonesia. The 2003 State Department Country Report states that the Indonesian Government promotes tolerance and that ethnic Chinese are major contributors to the country's economy. We will not disturb the IJ's holding.

With respect to his claim for religious persecution, Soegianto is unable to demonstrate either that he was individually persecuted against or that there is a pattern or practice of persecution against Chinese Christians. See 8 C.F.R. § 208.16(b)(2)(i). In terms of individual persecution, Soegianto's brief on appeal makes no mention of any incidents in which Soegianto was persecuted. Instead, he focuses on what he deems to be a pattern and/or practice of persecution against similarly situated persons. As we stated in Lie, to constitute a "pattern or practice," the persecution of the group must be "systemic, pervasive, or organized." 396 F.3d at 537 (quoting Ngure v. Ashcroft, 367 F.3d 975, 991

7

(8th Cir. 2004)).  We rejected the argument that there was a pattern or practice of persecution in Lie, and we are not compelled to hold differently in this appeal.  Although Soegianto has submitted evidence that discrimination and harassment do occur in Indonesia based on one's Christian religious affiliation, that evidence does not amount to a pattern or practice of persecution on account of religion.  Moreover, the fact that the Indonesian Government stationed members of the army outside of a church to protect it demonstrates that the Indonesian Government "officially promotes religious and ethnic tolerance."  Lie, 396 F.3d at 537.  In addition, as the Government points out in its brief, the State Department's 2003 Country Report recognizes "a sharp drop in violence between Christians and Muslims," stating that "inter-religious tolerance and cooperation improved during the year."  A.R. at 224.  For the above reasons, we conclude that the IJ's decision not to grant Soegianto withholding of removal is supported by substantial evidence.  We will deny the petition for review.