

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-12-2008

# Suparkana v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3228

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Suparkana v. Atty Gen USA" (2008). *2008 Decisions*. Paper 1454.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1454

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3228
_____

AGNES SUPARKANA,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

_____

On Review of a Decision of the
Board of Immigration Appeals
(Agency No.  A96 266 014)
Immigration Judge:  Honorable Miriam K. Mills

Submitted pursuant to Third Circuit LAR 34.1(a)
January 15, 2008

Before: BARRY, CHAGARES and ROTH, Circuit Judges.

(Filed:    March 12, 2008)
_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge:

Agnes Suparkana petitions for review of an adverse Board of Immigration Appeals (BIA) decision. On May 30, 2006, the BIA denied Suparkana's requests for asylum, withholding of removal and relief under the Convention Against Torture (CAT), upholding the decision of an Immigration Judge (IJ). Because we are without jurisdiction to hear Suparkana's asylum claim, we must dismiss it. Because substantial evidence supports the IJ's and BIA's decisions regarding withholding of removal and CAT relief, we will deny these claims.

I.

The Attorney General may grant asylum to aliens who are "refugees" within the meaning of 8 U.S.C. § 1101(a)(42).[1] See 8 U.S.C. § 1158(b)(1). To be eligible, an applicant must "demonstrate[] by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States," 8 U.S.C. § 1158(a)(2)(B), unless the "alien demonstrates to the satisfaction of the Attorney General . . . extraordinary circumstances relating to the delay." 8 U.S.C. § 1158(a)(2)(D). If the Attorney General determines that a petition was untimely filed, and that no extraordinary circumstances exist, Courts of Appeals are without jurisdiction to review this finding

---

[1] Generally, a refugee is someone who demonstrates an inability or unwillingness to return to their prior country of residence "because of persecution or a well-founded fear of persecution" on account of one of five protected grounds: race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A).

2

unless it raises a constitutional claim or a question of law.  Compare 8 U.S.C. §

1158(a)(3) (stripping courts of jurisdiction) with 8 U.S.C. § 1252(a)(2)(D) (permitting

judicial review over constitutional claims and questions of law); see also Jarbough v.

Attorney General, 483 F.3d 184, 190 (3d Cir. 2007).

The Attorney General must grant withholding of removal if he "decides that the

alien's life or freedom would be threatened" in the country of removal due to one of the

five protected grounds.  8 U.S.C. § 1231(b)(3)(A).  The alien bears the burden of proving

that she will more likely than not face persecution on account of a protected ground.  See

INS v. Stevic, 467 U.S. 407, 429-30 (1984).[2]

Finally, an applicant for relief under the CAT bears the burden of establishing

"that it is more likely than not that he or she would be tortured if removed."  8 C.F.R. §

208.16(c)(2).  This standard "has no subjective component, but instead requires the alien

to establish, by objective evidence that he is entitled to relief."  Sevoian v. Ashcroft, 290

F.3d 166, 175 (3d Cir. 2002) (internal quotation marks omitted).  We have held that "even

---

[2] Past persecution requires proof of "(1) one or more incidents rising to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed either by the government or by forces that the government is either unable or unwilling to control."  Mulanga v. Ashcroft, 349 F.3d 123, 132 (3d Cir. 2003).  We have defined persecution as "an extreme concept that does not include every sort of treatment our society regards as offensive."  Fatin v. INS, 12 F.3d 1233, 1243 (3d Cir. 1993).  Instead, it encompasses only grave harms such as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom."  Id. at 1240.  A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution.  See 8 C.F.R. § 1208.13(b)(1)(i).

3

cruel and inhuman behavior by government officials may not implicate the torture regulations," id., because "[t]orture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2).

## II.

Suparkana was born in 1974 and is a native and citizen of Indonesia. She is also a Catholic of Chinese descent. Suparkana arrived in the United States on February 10, 2001 on a non-immigrant visa. On March 31, 2003, Suparkana filed her application for asylum, withholding of removal and CAT relief. The Department of Homeland Security issued Suparkana a Notice to Appear on May 28, 2003, charging her with being removable for overstaying her visa.

## A.

On December 21, 2004, the IJ held a hearing on Suparkana's claims. Suparkana argued that her asylum application should be considered, notwithstanding that she filed it outside of the one-year deadline, because the delay was caused by extraordinary circumstances. Specifically, Suparkana claimed that upon arrival in the United States, she suffered from post-traumatic stress disorder (PTSD) as a result of the psychological effects of her persecution, and this rendered her incapable of applying for asylum.

To support this assertion, Suparkana proffered a psychiatric evaluation performed by Dr. Laura Sanchez, an Assistant Professor of Psychiatry at the University of

Pennsylvania (the Evaluation). After a one-hour examination performed on May 17, 2004, Dr. Sanchez had opined "to a reasonable degree of medical certainty" that "Ms. Suparkana suffers from chronic [PTSD] . . . as a result of traumatic events associated with the political situation" in Indonesia. JA 110 (Evaluation at 3).

The government moved to exclude the Evaluation because it did not have a chance to cross-examine Dr. Sanchez. The IJ agreed, holding the Evaluation "inadmissible in light of the briefness of the evaluation" and "the fact that it is unsworn and the psychiatrist was not made available for either live or telephonic testimony." JA 22 (Dec. 21, 2004 Op. at 3). The IJ did, however, enter into the record an Assessment to Refer completed by the asylum officer who first interviewed Suparkana. This Assessment indicated that Suparkana stated she had not applied for asylum on time because she did not know about it, not because of PTSD.

After making these evidentiary findings, the IJ heard testimony. Suparkana was asked whether her ignorance of the asylum process was "the only reason that you did not timely file?" JA 92 (Dec. 21, 2004 Hrg. Tr. at 62). Suparkana replied, "Yes, that's my position." Id. After the IJ asked why, if Suparkana was not mentally competent, she had not mentioned her incompetence to the asylum officer, Suparkana replied that it was "[b]ecause I didn't know what the political process [was.]" Id.

The IJ held that Suparkana had not met her burden of showing by clear and convincing evidence that her application was filed within one year after the date of her

arrival in the United States, or that "extraordinary circumstances" could toll the statute's application. See JA 22-23 (Dec. 21, 2004 Op. at 3-4); see also 8 U.S.C. § 1158(a)(2)(B). The IJ relied, primarily, on Suparkana's own testimony at the December 21, 2004 hearing, which the IJ found to be overwhelming evidence that ignorance, and not PTSD, caused Suparkana's filing delay. See id. The BIA upheld both the IJ's evidentiary findings and her asylum decision. See JA 4 (May 30, 2006 BIA Op. at 1).

Suparkana now argues that the IJ's exclusion of the Evaluation and inclusion of the Assessment violated her due process rights by depriving her of a "neutral and impartial hearing." Suparkana Br. at 8. According to Suparkana, the IJ's professed problems with the Dr. Sanchez Evaluation went to its credibility, not its admissibility, and the IJ's "reliance" on the Assessment to Refer did not comport with an operating policy of the Executive Office for Immigration Review, "which expressly prohibits the use of the Assessment to Refer in areas dealing with an alien's credibility." Id.

We are without jurisdiction to hear this claim. See 8 U.S.C. § 1158(a)(2)(B), (a)(3). In Tarrawally v. Ashcroft, 338 F.3d 180, 185 (3d Cir. 2003), we explained that § 1158(a)(3) "clearly deprives us of jurisdiction to review an IJ's determination that an asylum petition was not filed within the one year limitations period, and that such period was not tolled by extraordinary circumstances." Although "[t]he REAL ID Act of 2005 create[d] a narrow exception to this prohibition to permit judicial review over constitutional claims and questions of law raised in petitions for review," Jarbough, 483

6

F.3d at 190, it is settled that "courts of appeals continue to have no jurisdiction to review discretionary . . . determinations presented in petitions for review," id. at 188.  We have held specifically that "arguments such as that an Immigration Judge . . . failed to consider evidence . . . are not questions of law under § 1252(a)(2)(D)."  Id. at 189.  Therefore, Suparkana's claim that the IJ refused to consider certain evidence, and improperly considered other evidence, falls squarely into the category of claims over which we remain without jurisdiction.  See Jarbough, 483 F.3d at 189 (finding no jurisdiction over due process claim that IJ's extraordinary circumstances analysis "ignored certain evidence").

B.

We do have jurisdiction to review the Attorney General's denial of withholding of removal, based upon our ability to review final orders of removal.  See 8 U.S.C. § 1252(a).[3]  This Court applies the "extremely deferential" substantial evidence standard to the Attorney General's findings of fact.  Chen v. Ashcroft, 376 F.3d 215, 223 (3d Cir. 2004).  Accordingly, we will reverse the Attorney General's determinations on issues like past persecution, the likelihood of future persecution, and the likelihood of torture only if "the evidence not only supports a contrary conclusion, but compels it."  Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001).

---

[3] On this issue, the BIA affirmed without an independently reviewable decision, and so we review the IJ's decision as the final agency determination.  See Berishaj v. Ashcroft, 378 F.3d 314, 322 (3d Cir. 2004) (citing 8 C.F.R. § 3.1(e)(4)).

7

Suparkana asserts that she has been "subjected to a life of harassment and discrimination because of my being a Chinese and a Christian[] in an Islamic country." JA 116 (I-589 at 5). She refers to a number of instances in which Muslim Indonesians derided her ethnicity and taunted her for being Chinese. She also claims that in 1991, she and her sister were robbed in a bakery. Although many Muslims were in the store, she and her sister were the only ones victimized. Finally, she refers to two incidents of inappropriate sexual contact: first, while in public elementary school, a group of five Muslim students touched her in sexual ways and stared at her body, which made her extremely self-conscious; and second, in 1993, as Suparkana and a friend walked into a public plaza, a group of Muslim men blocked their path and assaulted Suparkana and her friend, touching and rubbing their hands "all over us, including our breasts and hips." JA 122 (I-589 at 12). Suparkana states that "many Chinese women were captured and ra[p]ed" in anti-Chinese rioting that gripped Indonesia in May 1998, and she asserts that although she was neither captured nor raped, she "fear[s] . . . that they will catch me next time and rape me or perhaps kill me." JA 117 (I-589 at 6).

The IJ decided that Suparkana had not met her burden of establishing a threat to her life or freedom by a clear probability. See Jarbough, 483 F.3d at 190. The IJ first noted that in the May 2004 annual report of the United States Commission on International Religious Freedom – whose conclusions were stipulated to by the parties – religiously-motivated violence in Indonesia was limited largely to the Moluccan Islands

8

and to Sulawesi, but Suparkana showed "no connection to any of these areas." JA 23 (Dec. 21, 2004 Op. at 4). Moreover, while the IJ sympathized with Suparkana's experiences of sexual harassment, the IJ decided that there had been no showing, either by Suparkana or by the 2003 Department of State Country Report for Indonesia, "that ethnic Chinese women are the only targets" of rape and sexual harassment, or that Suparkana's tormentors were motivated "on account" of any protected ground. Therefore, Suparkana failed to show that there was a clear probability that she would be persecuted if she returned to Indonesia.

Suparkana now argues that she has demonstrated her eligibility for withholding of removal based on "aggregated incidents of past mistreatment suffered in [her] home country." Suparkana Br. at 13-14. Suparkana analogizes her situation to that of the petitioner in Matter of O-Z- & I-Z-, 22 I. & N. Dec. 23 (B.I.A. 1998). In Matter of O-Z-, a Jewish Ukranian national suffered numerous beatings, repeatedly received personalized anti-Semitic flyers and written threats at his home, and had his apartment broken into and his possessions destroyed. Id. at 24. Further, his son was beaten and sexually humiliated in a manner designed to expose his Judaism. Id. The BIA found in favor of the petitioners, both because their injuries rose to the level of persecution and because petitioners had shown that "in each instance, the persecutors were motivated by a desire to punish the respondent and his son on account of their Jewish nationality." Id. at 26.

The instant case is distinguishable. Suparkana has not alleged incidents similar in degree to those recounted in In re O-Z-. Although Suparkana listed two incidents of sexual harassment and stated her fears of being raped, this is simply not the type of harm needed to compel a finding of persecution. C.f. Fatin, 12 F.3d at 1240, 1243. More importantly, however, Suparkana makes no colorable showing that her tormentors – besides those who called her names – were motivated by anti-Christian or anti-Chinese animus. She therefore fails to demonstrate that her troubles were "on account of" her religion or ethnicity. See 8 U.S.C. § 1101(a)(42)(A); see also Mulanga, 349 F.3d at 132. Rather, Suparkana appears to have been the victim of ordinary criminal and harassing activity – unfortunate and humiliating, to be sure, but not persecution under applicable law.

C.

Suparkana's brief does not provide any separate analysis of her CAT claim. Based on our review of the record, however, substantial evidence supports the IJ's determination that Suparkana has not shown she is more likely than not to be tortured upon her return to Indonesia. See Lukwago v. Ashcroft, 329 F.3d 157, 182-83 (3d Cir. 2003). Suparkana, therefore, cannot obtain CAT relief.

IV.

For the foregoing reasons, we will dismiss in part and deny in part Suparkana's petition for review.

10